



Agreement Reference Number: []

## HOSTING SERVICES AGREEMENT

**THIS HOSTING SERVICES AGREEMENT** (the "**Agreement**") is made on 11th November, 2024 (the "**Effective Date**").

**BETWEEN:**

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**,
a corporation incorporated under the laws of the State of Georgia,
having its registered office at
900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076

("**BITMAIN**")

and

**OLD CONST LLC.**,
a limited liability company formed
under the laws of the State of Delaware
having its registered office at 254 Chapman Rd, Ste 209, Newark DE 19702

("**Service Provider**"),

each of the parties to this Agreement is referred to herein individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS:**

A.      Service Provider is wholly owned, directly or indirectly, by Fenshou CHEN (the "**Service Provider Parent**").

B.      Service Provider is the lessee and operator of the Data Center Facility and provides the Services at the Data Center Facility and has leased certain Premises to BITMAIN in accordance with the Lease Agreement.

C.      BITMAIN desires to engage Service Provider to provide the Services, and Service Provider is willing to perform such Services, in each case, in accordance with the terms and conditions of this Agreement.

D.      The Parties have entered into the Collaboration Sale Agreement dated as of the date hereof (the "**Collaboration Sale Agreement**") for the purchase of certain Products, defined therein and the payment of the Net Total Price, defined therein.

E.      The Parties have entered into the Collaboration Agreement dated as of the date hereof (the "**Collaboration Agreement**") wherein the Service Provider agreed to pay the Discounted Amount, defined in the Collaboration Sale Agreement, for such Products by providing Wholesale Hosting Unit Price (as defined below) under this Agreement.

F.    The Parties have entered into the On-Rack Sales and Purchase Agreement dated as of the date hereof (the "**On-Rack SPA**"), wherein Purchaser agrees to purchase the HASH Super Computing Server hosting in the Data Center Facility, as set forth in the Hosting Services Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants set forth in this Agreement, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    <u>**DEFINITIONS AND INTERPRETATIONS**</u>

    1.1    <u>Definitions</u>. In this Agreement, the capitalized terms have the following meanings:

"**Actual Hosting Unit Price**" means the effective unit price per kWh applicable during the relevant Billing Period set forth in Appendix I, which shall be (i) during the Discount Repayment Period, the Wholesale Hosting Unit Price; and (ii) immediately after conclusion of the Discount Repayment Period, the same as the Settlement Hosting Unit Price; subject to the adjustment mechanism in accordance with Sections 3.2 and 6.11(c).

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"**Agreement**" means this Hosting Services Agreement, all appendices, schedules, exhibits, change orders or statements of work entered into pursuant to this Hosting Services Agreement and any written amendments hereto and thereto.

"**Applicable Law**" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, local law, law of any other province, state or municipality or international law, and which creates or purports to create any requirement or rule that affects, restricts, prohibits or applies to this Agreement or either Party.

"**Billing Period**" means the period which Service Provider issues invoices to BITMAIN for the Services provided by Service Provider, commencing on (a) for the first Billing Period, 00:00 (Beijing Time) on the Power-On Date until 23:59 (Beijing Time) on the last calendar day of the same month; or (b) for each of the subsequent Billing Periods, 00:00 (Beijing Time) on the first calendar day of the month following the previous Billing Period until 23:59 (Beijing Time) on the last calendar day of such month.

"**BITMAIN Indemnitees**" has the meaning ascribed to it in Section 9.1.

"**BITMAIN Personnel**" has the meaning ascribed to it in Section 6.9.

"**BITMAIN Property**" has the meaning ascribed to it in Section 8.1.

"**Business Day**" means a day, which is not a Saturday, Sunday or a bank holiday on which banking institutions in China and the Relevant Jurisdiction are not open for business.

"**Change of Control**" means, with respect to a Person, that Control of such Person is acquired by a Person that was not, prior to the acquisition, Controlling, Controlled by, or under common Control with such Person, whether by way of a single transaction or series of transactions.

"**Change of Control Transaction**" means a transaction or a series of transactions by virtue of a merger, consolidation, asset purchase, reorganization, plan of exchange or any other transaction that would result in (a) a Person acquiring, directly or indirectly, or receiving the right to acquire, directly or indirectly, all or substantially all of the assets of the Service Provider (including, through an exclusive license); (b) a Change of Control of the Service Provider, or (c) Service Provider's shareholders immediately prior to such transaction or series of transactions owning less than a majority of the voting securities of the Service Provider or any successor thereto.

"**Confirmation Period**" means the meaning ascribed to it in Section 3.7(b)(ii).

"**Confirmed Hosting Fee**" means the meaning ascribed to it in Section 3.7(b)(ii).

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through contract or the ownership of securities entitled to more than fifty percent (50%) of the votes outstanding of the such Person, or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "Controlled" and "**Controlling**" have the same meaning.

"**Daily Theoretical Electricity Cost**" means ∑*Rated Power of affected Hosted Servers × 24(h) × Actual Hosting Unit Price.*

"**Daily Theoretical Revenue**" means the amount resulting from the following calculation:

*(∑Rated Power of affected Hosted Servers × Reward Per Block × (24(h)×60(min)×60(sec)) × Bitcoin Price)*

*Divided by*

*(Difficulty × 2^{32})*

*Where*

    (a)    *"**Reward Per Block**" has the meaning set out in the following website: https://btc.com/stats/diff (or a successor site thereto) and taken as the monthly average for the month(s) of the applicable losses.*

    (b)    *"**Difficulty**" has the meaning set out in the following website: https://bitinfocharts.com/bitcoin/ (or a successor site thereto) and taken as the monthly average for the month(s) of the applicable losses.*

    (c)    *"**Bitcoin Price**" means the average price of Bitcoin published on* Coinmarketcap (https://coinmarketcap.com/) *for the month preceding the date of loss which average price if less than $30,000 shall be deemed to be $30,000.*

"**Data Center Facility**" means the data center facility operated by Service Provider as set forth in Exhibit A of Appendix I.

"**Data Center Facility Staff**" means the property site manager(s), director(s), and primary points of contact at the Data Center Facility as set forth in Appendix I and amended from time to time in writing (including email) by BITMAIN.

"**Discounted Amount**" has the meaning set out in the Collaboration Sale Agreement.

"**Discount Repayment Period**" has the meaning set out in the Collaboration Agreement.

"**DCF Agreement**" has the meaning ascribed to it in Section 4.2(e).

"**Delay Compensation**" means the corresponding amount payable by either Party as compensation for its delayed performance in accordance with Sections 3.4(b), 3.4(c) and 3.4(d).

"**Deposit**" means the amount payable by BITMAIN to Service Provider calculated in accordance with the following formula: Deposit = Hosting Quantity for the respective batch of the Hosted Servers × 3.6 (kW) × Settlement Hosting Unit Price or Wholesale Hosting Unit Price, as applicable × 24 (h) ×30 (d). The specific amount of the Deposit shall be set forth in Section 2.2 of Appendix I, subject to the adjustment in accordance with Sections 6.1(b) or 6.2(a).

"**Digital Assets Price**" means the price of the applicable digital asset at the relevant hour (Beijing Time), denominated in US dollars and published on the website of Coinmarketcap (https://coinmarketcap.com/) or another credible third-party platform determined by BITMAIN.

"**Emergency**" means an event occurring at or impacting the Data Center Facility or any immediately adjoining property that poses actual or imminent (a) risk of serious personal injury to any person; (b) physical risk to the Data Center Facility including access to power or internet connection to the Data Center Facility; or (c) risk to the safety or stable operation of the Hosted Servers including their ability to generate their Rated Hashrate; which Service Provider or BITMAIN, reasonably believe require immediate preventative or remedial action.

"**End-Period Meter Reading**" means the meter reading of the Separate Meter taken at 23:59 (Beijing Time) on the last day of the applicable Billing Period.

"**Delivery date**" has the same meaning set forth in APPENDIX I and EXHIBIT B of APPEXDIX I (when applicable).

"**Facility Approval Date**" means the date when BITMAIN confirms in writing that the Data Center Facility has passed the inspection of BITMAIN and all other conditions set forth in Exhibit A of Appendix I.

"**Force Majeure**" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including acts of God, war, terrorism, blockade, fire, strikes, riots, insurrections, civil commotions, pandemics, epidemics, earthquakes, landslides, avalanches, floods, hurricanes or Emergencies but only if and to the extent that such circumstance cannot be prevented, avoided, remedied, or removed despite the exercise of good faith and reasonable diligence by the affected Party and such Party has taken all reasonable precautions, due care, and reasonable alternative measures in order to avoid the effect of such event on the Party's ability to perform its obligations under this Agreement and to mitigate the consequences thereof.

"**Governmental Authority**" means any agency, authority, regulatory body, court, administrative tribunal, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions in accordance with lawful authority.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award issued by or with any Governmental Authority.

"**Health and Safety Manual**" means the health, safety and environmental program and manual developed by Service Provider in accordance with Applicable Laws and Industry Practices, as approved in writing by BITMAIN.

"**Hosted Servers**" means the supercomputing servers and ancillary hardware equipment owned by BITMAIN or its designated Representatives and hosted at the Data Center Facility pursuant to this Agreement which for the avoidance of doubt, shall not include the Products.

"**Hosting Capacity**" means the total amount of MW of energy available for BITMAIN at the Data Center Facility as set out in Appendix I.

"**Hosting Fees**" means the fees for the Services payable by BITMAIN to Service Provider based on the Power Consumption during the applicable Billing Period, which shall be calculated in accordance with Section 3.1. For clarity, in no event shall the Hosting Fees be determined in accordance with the quantity of Hosted Servers.

"**Hosting Fees Ratio**" means the ratio of (a) Power Consumption multiplied by the Normal Hosting Unit Price to (b) the sum of each Hosted Server's Theoretical Hashrate PPS Income during the relevant period.

"**Hosting Quantity**" means the agreed quantity of the Hosted Servers set forth in Appendix I, for which Service Provider shall provide the Services and Hosting Capacity, the details of which shall be initially set forth in Section 1 of Appendix I and subject to adjustment in accordance with the terms of this Agreement, or as otherwise agreed to in writing by the Parties.

"**Incentive Coupon**" has the meaning ascribed to it in Section 3.9.

"**Industry Practices**" means those practices, methods, acts, equipment, specifications and standards of safety and performance, as the same may change from time to time, which a prudent owner or operator in the United States of a data center facility, cryptomining equipment or other ancillary hardware equipment of a type and size similar to the Data Center Facility would use or follow to accomplish the desired objectives and results lawfully, reliably and safely. Notwithstanding the foregoing, Industry Practices are not intended to be limited to the optimum practices, methods, acts, equipment, specifications or standards of safety and performance to the exclusion of all others but rather to be acceptable practices, methods, acts, equipment, specifications and standards of safety and performance generally accepted in the industry or requirements to comply with Applicable Law.

"**Initial Date**" means the first Power-On Date of Hosted Servers, set forth in Appendix I.

"**Intellectual Property Rights**" means any and all right, title and interest in and to all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how and any and all other intellectual property or proprietary rights, including but not limited to those concerning inventions, patents, utility

models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any derivative rights therefrom.

"**Inventory Assets**" means any asset stored or kept by BITMAIN at the Data Center Facility, other than the Hosted Servers and Products, including servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are returned for maintenance and repair, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers, and the packaging materials for the Hosted Servers.

"**Knowledge**" means, with respect to Service Provider, the actual knowledge of the management team of Service Provider, including knowledge which should have been acquired by Service Provider after making inquiries and exercising due care and skill.

"**Lease Agreement**" means the lease agreement between the Service Provider and BITMAIN attached hereto as Appendix VI.

"**Low Power Mode**" means the mode in which the Hosted Servers operate allowing them to consume less electrical power than Rated Power and contribute less hashrate than Rated Hashrate.

"**Minimum Power Commitment**" means, if applicable, the minimum amount of the aggregate electrical power that must be consumed by the Hosted Servers during each Billing Period as set forth in Appendix I.

"**Minimum Hosting Unit Price**" means the unit price per kWh set out in Appendix I.

"**Mining Proceeds**" shall be the amount calculated in accordance with the following formula: *(Daily Theoretical Revenue - Daily Theoretical Electricity Cost) x number of affected days in the applicable calculation period*.

"**Monitoring Software**" means the software designated by BITMAIN to monitor the operation of the Hosted Servers, which shall initially be AntSentry (version V2 or such other version as may be upgraded by BITMAIN from time to time) unless otherwise designated by BITMAIN.

"**Monthly Theoretical Hosting Fee**" means the theoretical amount of the Hosting Fees for one (1) month, which shall be calculated in accordance with the following formula: *Monthly Theoretical Hosting Fees = ∑Rated Power of Each Hosted Server Powered-On (kWh) × Settlement Hosting Unit Price or Wholesale Hosting Unit Price, as applicable × 24(h) × 30 (d)*.

"**Monthly Average Online Qualified Ratio**" means the ratio of the sum of the number of Hosted Servers in Qualified Status every day during the applicable Billing Period to the sum of the number of Hosted Servers in Online Status every day during the applicable Billing Period, which shall be calculated in accordance with the following formula: *Monthly Average Online                          Qualified                          Ratio                          =*
$\sum_{i=1}^{n} Daily\ Quantity\ of\ Hosted\ Servers\ in\ Qualified\ Status$                    /

$\sum_{i=1}^{n} Daily\ Quantity\ of\ Hosted\ Servers\ in\ Online\ Status$, where "n" shall mean the number of calendar days of the applicable Billing Period.

"**Normal Hosting Unit Price**" means the unit price per kWh set out in Appendix I.

"**Online Status**" means the status of a Hosted Server that is powered-on with a constant supply of electrical power, has stable internet connection and shows a status of "Online" via the Monitoring Software and is detectable by ANTPOOL.

"**Online Status Ratio**" means the amount resulting from the following calculation:

$\sum Daily\ Hashrate \times 24(h)$

*Divided by*

*Number of Hosted Servers* x *Rated Hashrate of the Hosted Servers* x *Theoretical Online Hours*

> *Where:*
>
> > (a) "***Daily Hashrate***" is the hashrate of the applicable Hosted Servers detected by ANTPOOL;
> >
> > (b) "***Theoretical Online Hours***" means the number of hours in such applicable Billing Period which may exclude the time during which a compulsory power curtailment occurs as a result of a government directive, Governmental Order or load limitation program implemented by a Governmental Authority or relevant power supplier, provided that such compulsory power curtailment is not caused by Service Provider (including as a consequence of a breach of any Government Order or the Power Purchase Agreement by Service Provider) and the Service Provider notifies BITMAIN of such compulsory power curtailment and provides evidence of such power curtailment acceptable to BITMAIN at its sole discretion acting reasonably.

For the avoidance of doubt, calculation of Online Status Ratio for the purposes of Section 3.5, Section 3.9 and Section 6.11 shall not be adjusted for any technical failures or any power curtailment, power reduction, power restriction or power outage due to any reason, including any event of Force Majeure.

"**OSR Payment**" is the result of (Power Consumption in a Billing Period) * (Settlement Hosting Unit Price less Wholesale Hosting Unit Price) * (95% less the Online Status Ratio for such Billing Period).

"**Outstanding Discount**" has the meaning set out in the Collaboration Agreement.

"**Outside Litigation**" has the meaning ascribed to it in Section 17.7.

"**Partner Entities**" means any Person in which BITMAIN or any Affiliates of BITMAIN or any significant shareholders of BITMAIN hold a significant ownership interest within. For purposes of the definition of Partner Entities, "**significant**" shall mean shareholdings or ownership interests, directly or indirectly, in the aggregate in such Person exceeding 25%

based on the issued and outstanding shares or ownership interests in such Person, provided that BitFuFu Inc. and its Affiliates shall be deemed to be a Partner Entity of BITMAIN.

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"**Personal Information**" means any information that is considered "personal data", "personal information," "personally identifiable information," "PII," or any equivalent term under applicable Privacy Laws as well as all information that, alone or in combination with other information is regarding or reasonably capable of being associated with an identified or identifiable individual, device, or household.

"**Power-off Servers**" means the Hosted Servers that are powered off voluntarily by BITMAIN pursuant to Section 5.1.

"**Power-On Date**" means the date that the applicable batch of Hosted Servers are to be powered-on by Service Provider as set out in Appendix I.

"**Power Consumption**" means the amount of electrical power consumed by the Hosted Servers during the applicable Billing Period, including any of the Hosted Servers on Low Power Mode, which shall be determined by subtracting the End-Period Meter Reading of the Billing Period immediately preceding the relevant Billing Period from the End-Period Meter Reading of the relevant Billing Period, the unit of which shall be kWh.

"**Power Consumption Difference**" means the percentage resulting from the following calculation:

$(($*Power Consumption* $\div$ *Theoretical Power Consumption*$) - 1) \times 100$

> *Where*:

>> "***Theoretical Power Consumption***" means $\sum$*Rated Power of Each Hosted Server Powered-On (kWh)* $\times$ *24(h)* $\times$ *number of days in the applicable Billing Period*

"**Power Purchase Agreement**" means the power purchase agreement, or other similar agreement for procurement of electrical power for the Data Center Facility, entered into between Service Provider and the relevant power supplier.

"**Prepayment**" has the meaning ascribed to it in Section 3.6.

"**Premises**" has the meaning ascribed to it in the Lease Agreement.

"**Products**" has the meaning ascribed to it in the Collaboration Sale Agreement.

"**Qualified Status**" means the status in which the Hosted Server is in normal operation and the average hashrate of the Hosted Server in eight (8) consecutive hours is above or equal to eighty percent (80%) of the Rated Hashrate of the Hosted Server.

"**Rated Hashrate**" means the rated hashrate stated on the factory label of the applicable Hosted Server.

"**Rated Power**" means the rated electrical power stated on the factory label of the applicable Hosted Server.

"**Reconciliation Statement**" means the statement issued by Service Provider to BITMAIN during each Billing Period for reconciliation between the Parties, setting out the Power Consumption, the Actual Hosting Unit Price, the Online Status Ratio, Hosting Fees, any interruption or suspension of any Service during such Billing Period, the form of which is set out in Appendix II.

"**Relevant Jurisdiction**" means the State of Texas, United States of America.

"**Required Permits**" means any authorization, approval, consent, certificate, license, permit or franchise of or from any Governmental Authority required for the ownership (if applicable to Service Provider) and operation of the Data Center Facilities and the provision of the Services under this Agreement.

"**Separate Meter**" means the separate meter installed by Service Provider at the Data Center Facility for metering the electrical power consumed by the Hosted Servers.

"**Services**" means the hosting services provided by Service Provider to BITMAIN pursuant to this Agreement set forth in Appendix I. For clarity, the Parties acknowledge and agree that the Services do not include any operation or maintenance of the Hosted Servers.

"**Settlement Hosting Unit Price**" means the unit price per kWh set out in Appendix I.

"**Theoretical Hashrate PPS Income**" means the theoretical earnings of the Hosted Server based on the Rated Hashrate of such Hosted Server with reference to the prevailing network difficulty during the relevant period (which for Bitcoin is set out in *https://bitinfocharts.com/bitcoin/* (or a successor site thereto)) and the Digital Assets Price, which shall be calculated based on the real-time total network hashrate and the average price of the applicable Digital Asset Price over a 48 hour period with a sampling frequency of at least once an hour, and the average value of the relevant data in each relevant period shall be the Theoretical Hashrate PPS Income of such period. For avoidance of doubt, the Parties agree that: (a) when calculating the Hosting Fees Ratio for the Actual Hosting Unit Price Adjustment in accordance with Section 3.2 or the provision of Incentive Coupon in accordance with Section 3.9, the relevant period shall be the corresponding Billing Period; (b) when calculating the Hosting Fees Ratio for the voluntary power-off in accordance with Section 5, the relevant period shall be 336 consecutive hours (being a period that is 14 consecutive days) as stipulated in Section 5.1.

"**Total Hosting Fee Discount**" has the meaning set out in the Collaboration Agreement.

"**Wholesale Hosting Unit Price**" has the meaning ascribed to it in Appendix I**.**

1.2    Interpretation. For purposes of this Agreement: (a) the words "include," "includes," and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; (d) words denoting the singular have a comparable meaning when used in the plural, and vice versa; I words denoting any gender include all genders; and (f) headings in this Agreement are for convenience only. Unless the context otherwise requires,

references in this Agreement: (i) to sections, exhibits, schedules, attachments, and appendices mean the Sections of, and exhibits, schedules, attachments, and appendices to this Agreement; (ii) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Parties intend this Agreement to be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The exhibits, schedules, attachments, and appendices referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

1.3    <u>Purpose and Order of Priority</u>. This Agreement is to be read and interpreted in conjunction with the Collaboration Sale Agreement and the Collaboration Agreement. In the event of a conflict between the terms of (a) this Agreement and the Collaboration Agreement; and (b) this Agreement, the Collaboration Sale Agreement and the Collaboration Agreement, the terms of the Collaboration Agreement shall govern in all such circumstances.

## 2.    **SCOPE OF SERVICES**

Subject to the terms and conditions of this Agreement, Service Provider shall provide to BITMAIN, and BITMAIN shall receive from Service Provider, the Services set forth in Appendix I.

## 3.    **HOSTING FEES AND PAYMENT**

3.1    <u>Hosting Fees Calculation</u>. Hosting Fees for each Billing Period shall be calculated as follows:

Hosting Fees = Power Consumption × Actual Hosting Unit Price

3.2    <u>Actual Hosting Unit Price Adjustment</u>. The Actual Hosting Unit Price shall be subject to the following adjustment for each Billing Period after conclusion of the Discount Repayment Period:

(a)    <u>Downward Adjustment</u>. If the Hosting Fees Ratio for such Billing Period is higher than 90%, the Actual Hosting Unit Price applicable to such Billing Period, unless agreed to otherwise by the Parties, shall be adjusted to the higher of:

(i)    an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

(ii)    the Minimum Hosting Unit Price.

(b)    <u>Upward Restoration</u>. In the event that (x) the Actual Hosting Unit Price is lower than the Settlement Hosting Unit Price; and (y) the Hosting Fees Ratio

for such Billing Period is less than 70%, the Actual Hosting Unit Price applicable to such Billing Period shall be adjusted to the lower of:

(i)     an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

(ii)    the Settlement Hosting Unit Price.

(c)     In the event that there are two or more types of Hosted Servers, the Hosting Fees Ratio and adjustment of Actual Hosting Unit Price for a Billing Period shall be calculated and applied respectively for each type of Hosted Servers.

3.3     <u>Other Fees</u>. Other fees set forth in Appendix I shall be paid in accordance with the applicable terms set forth in Appendix I on a pay-per-use basis, provided that these fees have been approved in writing by BITMAIN prior to being incurred.

3.4     <u>Deposit</u>.

(a)     <u>Payment of Deposit</u>.  For the respective batch of Hosted Servers set forth in Appendix I, BITMAIN shall pay to Service Provider the Deposit set out in paragraph 2.2 of Appendix I within seven (7) Business Days of the on-racking of the applicable batch of Hosted Servers or as otherwise agreed by both Parties in the Appendix I.

(b)     <u>Delay Compensation</u>. The amount of the Delay Compensation shall be calculated as follows:

Delay Compensation = ∑Rated Power of each delayed Hosted Server *(kWh)* × US$0.01 × Number of delayed hours (any fractional delay of an hour shall be rounded up to the next hour)

(c)     <u>Delay in Delivery of Hosted Servers</u>. BITMAIN will arrange for the delivery of the respective batch of Hosted Servers to the Data Center Facility, provided there is no breach by the Service Provider under this Agreement, as specified in Appendix I or as otherwise agreed to by the Parties. In the event that BITMAIN fails to have the applicable batch of Hosted Servers delivered to the Data Center Facility on or before the delivery date set forth in Section 1.2 of Appendix I or as otherwise agreed to by the Parties:

(i)     BITMAIN shall pay Service Provider the Delay Compensation; and

(ii)    if BITMAIN fails to remedy such delay for the batch of Hosted Servers within thirty (30) calendar days, Service Provider shall be entitled to terminate the respective part of this Agreement regarding that batch of Hosted Servers by notice with immediate effect.

(d)     <u>Delay in Power-On of Hosted Servers</u>.

(i)     Except as otherwise agreed by the Parties, Service Provider shall ensure that the Hosted Servers are powered on for normal hosting and

operation by the Power-On Date for such batch of Hosted Servers as set forth in Section 1.2 of Appendix I.

(ii)　In the event Service Provider fails to satisfy Section 3.4(d)(i) for any reason, Service Provider shall immediately pay BITMAIN, within seven (7) Business Days, the corresponding Delay Compensation ; and, if such failure to comply with Section 3.4(d)(i) lasts longer than thirty (30) calendar days, BITMAIN shall, at its sole discretion, be entitled to immediately terminate this Agreement or the respective part of this Agreement regarding that batch of Hosted Servers, and Service Provider shall return the Deposit and pay the Delay Compensation to BITMAIN within seven (7) Business Days from such termination.

(e)　In the event of an adjustment to the Deposit or Prepayment, as applicable, in accordance with Section 6.1(b) or Section 6.2(a), Service Provider shall repay the difference between the pre-adjustment Deposit or Prepayment, as applicable, and the post-adjustment Deposit or Prepayment, as applicable, to BITMAIN in accordance with Section 6.1(b) or Section 6.2(a), as applicable.

3.5　<u>OSR Payment</u>. For each Billing Period Service Provider shall calculate the OSR Payment. If the OSR Payment is a positive amount, such amount shall be deducted from the amounts payable by BITMAIN for such Billing Period by BITMAIN. Alternatively, if the OSR Payment is a negative amount, the absolute value of such amount shall be added to the amounts payable by BITMAIN for such Billing Period. For the purpose of this Section 3.5, the Online Status Ratio shall not be adjusted for any technical failures or any power outage due to any reasons, including any event of Force Majeure.

3.6　<u>Billing Methods for Hosting Fees</u>. Service Provider may bill BITMAIN for the Hosting Fees using either of the following methods, as indicated in Appendix I:

(a)　<u>Post-use Payment Billing Method</u>.

The Deposit will be used to settle the Hosting Fees as follows for the first Billing Period following payment of each Deposit:

(i)　if the Hosting Fees are equal to the Deposit, the Deposit shall be applied to the Hosting Fees and the Hosting Fees shall be deemed to be fully paid and settled;

(ii)　if the Hosting Fees are less than the Deposit, the Deposit shall be applied to the Hosting Fees and the Hosting Fees shall be deemed to be fully paid and settled and the difference between the Deposit and the Hosting Fees (the "**Balance**") shall be used to offset the Hosting Fees in subsequent invoices; and

(iii)　if the Hosting Fees are greater than the Deposit, the Deposit shall be applied to the Hosting Fees and BITMAIN shall pay to Service Provider the difference between the Deposit and the amount of Hosting Fees on or before the Hosting Fees are due in accordance with

Section 3.7(b), and the Hosting Fees shall be deemed to be fully paid and settled upon BITMAIN's payment of such difference.

For subsequent Billing Periods:

(iv)  BITMAIN shall pay the amount of the Hosting Fees after deducting the Balance, if any, on or before the Hosting Fees are due in accordance with Section 3.7(b); and

(v)  if there is any unused Balance at the expiration or termination of this Agreement, Service Provider shall repay such unused Balance to BITMAIN within seven (7) Business Days from the expiration or termination of this Agreement.

(b)  <u>Prepayment Billing Method</u>.

For each Billing Period, BITMAIN shall make a prepayment in the amount as specified in Section 2.4 of Appendix I (the "**Prepayment**"). The Deposit shall be applied as the Prepayment for the first Billing Period following payment of each Deposit as follows:

(i)  if the Hosting Fees are equal to the Prepayment, the Prepayment shall be applied to the Hosting Fees and the Hosting Fees shall be deemed to be fully paid and settled;

(ii)  if the Hosting Fees are less than the Prepayment, the Prepayment shall be applied to the Hosting Fees and the Hosting Fees shall be deemed to be fully paid and settled and the difference between the Prepayment and the Hosting Fees shall serve as part of the Prepayment for subsequent Billing Periods;

(iii)  if the Hosting Fees are greater than the Prepayment, the Prepayment shall be applied to the Hosting Fees and BITMAIN shall pay to Service Provider the difference between the Prepayment and the Hosting Fees on or before the Hosting Fees are due in accordance with Section 3.7(b), and the Hosting Fees shall be deemed to be fully paid and settled upon BITMAIN's payment of such difference; and

(iv)  if there is any unused Prepayment at the expiration or termination of this Agreement, Service Provider shall repay such unused Prepayment to BITMAIN within seven (7) Business Days from the expiration or termination of this Agreement.

The prepayment billing method shall only be implemented for so long as all servers hosted at the Data Center Facility, including all servers of any third party customers of the Service Provider, are of ANTMINER brand, failing which, the billing method available to the Service Provider shall be the post-use payment billing method.

3.7  <u>Invoicing and Payment</u>.

(a)  Invoice. Service Provider shall issue an invoice for the Hosting Fees for each Billing Period to BITMAIN within seven (7) Business Days from the end of such Billing Period, with (1) the Reconciliation Statement for such Billing Period; and (2) the following supporting documents:

    (i)  a utility statement from the relevant power supplier evidencing the Power Consumption for such Billing Period;

    (ii)  photos of the Separate Meter showing the Power Consumption at the beginning and end of such Billing Period;

    (iii)  an invoice for the Power Consumption of such Billing Period issued by the relevant power supplier to Service Provider;

    (iv)  an account statement from the power supplier to the Data Center Facility confirming that there are no overdue amounts owing by Service Provider to such power supplier;

    (v)  the calculation of the OSR Payment;

    (vi)  the calculation of the aggregate Total Hosting Fee Discount provided by Service Provider from the Power-On Date up to the end of the applicable Billing Period and the Outstanding Discount as at such date; and

    (vii)  a confirmation of the Hosted Servers' security (in the form as attached in Appendix III hereto) which provides the latest information of the Hosted Servers and the current business operation of Service Provider.

(b)  Objections to Invoices. BITMAIN shall notify Service Provider of any objection to any invoice within five (5) Business Days upon receipt of such invoice by Service Provider:

    (i)  where BITMAIN raises no objection, BITMAIN shall pay the invoice within seven (7) Business Days after BITMAIN's receipt of the invoice in accordance with Section 3.6, provided the invoice complies with Section 3.7(a).

    (ii)  where BITMAIN raises any objection to an invoice or the supporting documentation provided as attachments to such invoice, the Parties shall diligently cooperate to resolve the any such Dispute within seven (7) Business Days of BITMAIN's objection or as otherwise agreed (the "**Confirmation Period**"). Should the Parties successfully resolve such dispute within the Confirmation Period, BITMAIN shall pay the Service Provider within seven (7) Business Days the amount as agreed by the Parties in the resolution of the dispute, if applicable.

    (iii)  In the event that the Parties are unable to resolve any objection to an invoice within the Confirmation Period in accordance with Section 3.7(b)(ii), the Parties agree that BITMAIN may elect to pay the Service Provider the lower of the invoiced Hosting Fee or the Monthly

Theoretical Hosting Fee for the applicable Billing Period in dispute as a full and final settlement of any objection to an invoice.

    (iv)    For avoidance of doubt, the Parties agree that Service Provider shall for the duration of an ongoing dispute in accordance with this Section 3.7(b): (A) continue to perform all its obligations under this Agreement and not suspend provision of Services or terminate this Agreement; and (B) continue to pay the electricity charges to the power supplier for the power provided to the Data Center Facility in a timely manner.

    (v)    If BITMAIN fails to make any payment due in accordance with the terms herein, interest shall accrue on the amount overdue at a rate of 1% per calendar month until paid in full, provided that if BITMAIN delays any payment due in accordance with this Section 3.7(b) for more than sixty (60) calendar days following its due date, Service Provider shall be entitled to terminate this Agreement or the respective part of this Agreement regarding that batch of Hosted Servers in issue by notice with immediate effect.

3.8    <u>Payment Method of Hosting Fees</u>. All payments of the Hosting Fees pursuant to this Agreement, including any remittance or refund of Hosting Fees, shall be made in accordance with Section 3 of Appendix I.

3.9    <u>Incentive Coupon</u>. If, following the Discount Repayment Period, the Online Status Ratio of two consecutive Billing Periods is above 98%, BITMAIN shall provide a coupon ("**Incentive Coupon**") to Service Provider in an amount equal to 5% of the Hosting Fees of such two consecutive Billing Periods. For the purpose of this Section 3.8, the Online Status Ratio shall not be adjusted for any technical failures or any power outage due to any reasons, including any event of Force Majeure.

3.10    <u>Increased Cost</u>. If there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs, utility cost increase, governmental fees or charges with respect to the provision of Services or the operation of the Data Center Facility, Service Provider shall by solely responsible for payment of such new charges.

3.11    <u>Variances in Power Consumption</u>. If during any applicable Billing Period the Power Consumption Difference is greater than 5% then Service Provider shall co-operate with BITMAIN to identify the source of such variance by: (A) providing materials reasonably requested by BITMAIN including the items listed in Section 3.7(a), (B) testing the power consumption efficiency of the Hosted Servers using power meters approved by BITMAIN and sharing the results of such tests with BITMAIN; and (C) provide access to BITMAIN to the Data Center Facility to conduct tests on the Separate Meters and Hosted Servers using BITMAIN's power meters and other tools.

3.12    <u>Set-off</u>. BITMAIN may set-off and deduct for any amounts payable to Service Provider under this Agreement against any amounts owing by Service Provider to BITMAIN pursuant to this Agreement, the Collaboration Agreement and the Collaboration Sale Agreement.

4.    **REPRESENTATIONS AND WARRANTIES**

4.1    Each Party represents and warrants to the other Party that:

(a)    such Party has full power, authority and right to execute and deliver this Agreement and to perform its obligations hereunder;

(b)    this Agreement has been duly executed and delivered by such Party and is valid and binding on such Party, enforceable in accordance with its terms;

(c)    such Party is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation and to carry on its business; and

(d)    the execution, delivery and performance of this Agreement do not and will not, contravene the constating documents of such Party or any Applicable Law, and do not and will not conflict with or result in a breach or violation of any indenture, agreement, instrument, judgment, decree, order or ruling to which such Party is a party or is otherwise subject to.

4.2    Service Provider represents and warrants to BITMAIN that:

(a)    it has provided BITMAIN with all the information and materials it has Knowledge of requested by BITMAIN and the subject matter of this Agreement including, without limitation, all materials requested and provided pursuant to the appendices hereto and all exhibits thereto. No information or materials provided by it, when taken as a whole, contains any untrue statement or omits to state any material fact. There is no information that Service Provider has not disclosed to BITMAIN in response to BITMAIN's inquiries, of which Service Provider has Knowledge;

(b)    it has good and marketable title to, or right by license, lease or other agreement to use, the Data Center Facility as contemplated under this Agreement, and there is no actual, pending or threatened dispute or other claim as to title, ownership or Service Provider's use of the Data Center Facility;

(c)    (i) the Service Provider holds all Required Permits necessary for the lawful conduct of the business of the Service Provider (including the operation of the Data Center Facilities) and for the performance of the Service Provider's obligations under this Agreement, (ii) all such Required Permits are valid and in full force and effect, and no event has occurred with respect to any such Required Permit that permits, or after notice or lapse of time (or both) would permit, revocation or termination thereof or could result in any other material impairment of the rights of the Service Provider in respect of any such Required Permit, (iii) all material fees and charges with respect to such Required Permits as of the date hereof have been paid in full, and (iv) the Service Provider is in full compliance with the terms and requirements of each Required Permit;

(d)    there is no Proceeding pending or, to the Knowledge of Service Provider, threatened, against Service Provider, any of its affiliates, or any of its properties, assets or business relating to or affecting this Agreement;

(e)    Service Provider is not insolvent or generally unable to pay its debts as they become due, or the subject of any voluntary or involuntary bankruptcy proceeding under any federal or foreign laws relating to bankruptcy or insolvency nor has Service Provider made an assignment in favour of its creditors nor a proposal in bankruptcy to its creditors or any class thereof nor had any petition for a receiving order presented in respect of it. No receiver has been appointed in respect of Service Provider, or any of its property or assets, and no execution or distress has been levied upon any of its property or assets;

(f)    to the Knowledge of Service Provider, Service Provider's current use and intended use under this Agreement of the Data Center Facilities complies in all material respects with all Applicable Laws, including zoning requirements, and Service Provider has not received any notification from any Governmental Authority or the landlord of any Data Center Facility in respect of any expropriation orders or any failure to use the Data Center Facilities in compliance with Applicable Laws. Service Provider is not and, to the Knowledge of Service Provider, no other party to any agreement for the lease, rent or use of the Data Center Facilities (such agreement, a "**DCF Agreement**") is, in breach of or default under, any DCF Agreement. To the Knowledge of Service Provider, no event has occurred that (with or without notice, lapse of time or both) would constitute a default by Service Provider under any DCF Agreement. Service Provider has not received any notice to terminate, in whole or in part or amend any DCF Agreement. The Service Provider has disclosed to BITMAIN all DCF Agreements and the details of any persons who have a significant interest in, or operation of, the Data Center Facilities;

(g)    the Services shall be free from defects and shall meet the specifications as stipulated herein (including provisions of Section 6); and

(h)    the execution, delivery and performance of this Agreement, do not conflict with any lease agreement between itself and any relevant landlord in connection with the Data Center Facility. BITMAIN shall not in any event be liable for any obligations to the landlord of any Data Center Facility (the "**Landlord**"), including rental or any other fees payable by Service Provider to the Landlord. Service Provider has obtained a duly executed undertaking in the form of Appendix IV for BITMAIN's benefit from the Landlord of any Data Center Facility, if applicable. Service Provider will take all measures to ensure the enforceability of such undertaking and will cooperate with BITMAIN in any effort of BITMAIN to enforce its terms, whether during or following the Term of this Agreement.

4.3    The Service Provider acknowledges and agrees that, in entering into this Agreement, BITMAIN has relied on the representations and warranties set forth in Sections 4.1 and 4.2.

50492704.6

5.    **VOLUNTARY POWER-OFF AND LOW POWER MODE**

5.1    In the event that the Actual Hosting Unit Price for any Billing Period has been adjusted to the Minimum Hosting Unit Price in accordance with Section 3.2, and the Hosting Fees Ratio has remained at 90% or higher for a period of 336 consecutive hours (being a period that is 14 consecutive days) in the subsequent Billing Period, BITMAIN shall be entitled to require the Service Provider to either (a) Power-off Servers; or (b) operate the Hosted Servers in Low Power Mode to reduce their Power Consumption.

5.2    Service Provider shall not Power-off Servers or operate the Hosted Servers in Low Power Mode without BITMAIN's express written direction.

5.3    Any Power-off Server may remain on rack at the Data Center Facility for a period of [fourteen (14)] calendar days, excluding the first day on which such Power-off Server is powered off (the "**Voluntary Power-off Period**"), during which BITMAIN shall be entitled to require the Service Provider, through written notice, to re-power on such Hosted Servers.

5.4    During the Voluntary Power-off Period, in the event that: (a) there is no Minimum Power Commitment set out in Appendix I, BITMAIN shall not be liable to pay to Service Provider any fee, charges or expenses whatsoever, and the Discount Repayment Period will be automatically extended for the period of the Voluntary Power-off Period unless otherwise determined by BITMAIN; or (b) there is a Minimum Power Commitment set out in Appendix I, Service Provider may request that BITMAIN continue operating a certain number of the Hosted Servers provided that the total Power Consumption of which shall not exceed the Minimum Power Commitment. In the event the Hosting Fees Ratio during such Voluntary Power-off Period exceeds 100%, the Hosting Fees will be automatically reduced such that the Hosting Fees Ratio for such period equals 100%.

5.5    Upon the expiration of the Voluntary Power-off Period, the Parties may elect to extend the Voluntary Power-off Period or either Party shall be entitled to terminate this Agreement with immediate effect without liability.

6.    **SERVICE PROVIDER COVENANTS**

6.1    <u>Conditions of the Data Center Facility</u>. From the Facility Approval Date and at all times up to and until the termination of this Agreement, Service Provider shall (a) be fully responsible for the conditions of the Data Center Facility, including, maintaining such Data Center Facility in a condition that is free from all known hazards, whether existing now or arising in the future, and in full compliance with all Applicable Laws, and (b) provide BITMAIN with sufficient server rooms, server positions, racks, power load and facilities, broadband network and network facilities, heat dissipation facilities, sand, rain and snow-proofing facilities, temperature and humidity monitoring and sensing equipment, security monitoring and other equipment reasonably required for the normal operation of the Hosted Servers  including the following requirements:

(a)     there shall be at least: two operators' dedicating network line access, network bandwidth configuration of 100Mbps per 10,000 Hosted Servers, network latency of no more than 100ms (based on the ping value from the Hosted Servers' intranet IP to ANTPOOL), and a network environment containing RJ45 interfaces shall be provided for the Monitoring Software's servers in the Data Center Facility's operation and maintenance network;

(b)     there shall be sufficient and qualified cooling water supply at the Data Center Facility. The water supply shall be stable and constant, with no sand or other impurities in the cooling tower pool. If the water supply conditions of the Data Center Facility are not satisfied for any reason whatsoever, BITMAIN shall be entitled to reduce the Hosting Quantity of Hosted Servers to satisfy the heat dissipation requirements of the miners at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to temperature reasons designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit or Prepayment, as applicable, in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit or Prepayment, as applicable, and the post-adjustment Deposit or Prepayment, as applicable, in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity;

(c)     there shall be necessary and adequate measures taken to prevent water accumulation and overflow into the Hosted Servers;

(d)     the measurement range of the temperature and humidity monitoring and sensing equipment shall cover -30℃ to 60℃. Temperature and humidity monitoring and sensing equipment may be wired transmission equipment or wireless transmission equipment, for the convenience of operation and maintenance real-time monitoring;

(e)     the water supply and ambient temperature shall satisfy the requirements set forth in this Agreement and the following standard operational conditions:

    (i)     the quality of the water shall meet the requirements applicable to the municipal water supply quality applicable to the Data Center Facility and in no situation shall be less than the water quality specifications provided in the ANTSPACE Water-cooling System Operation and Maintenance Manual provided by BITMAIN and as updated from time to time;

    (ii)    in the case of evaporative cooling (cooling tower), the temperature of water shall not exceed 30℃, with a supplying capacity of more than 1.5m³/MWh;

    (iii)   in the case of water-water heat exchange (plate heat exchanger), the water used shall be either fresh water or seawater. The temperature of which shall not exceed 25℃, with a supplying capacity of more than 50m³/MWh. The suspended solids in the water shall not exceed 20mg/L;

    (iv)    in the case of dry cooling, the maximum ambient temperature of the location of the Data Center Facility shall not exceed 35℃; and

    (v)    the coolant used, unless agreed to otherwise by the Parties, shall be deionized water or glycol antifreeze containing stabilizers;

(f)    there shall be sufficient forklifts, lift trucks and other related machinery and equipment to provide timely racking and de-racking services for the Hosted Servers; and

(g)    Service Provider shall conduct routine inspections and in no event less than once in every thirty (30) day period of and provide reports of such to BITMAIN of (1) the water supply equipment to eliminate potential risks, including water curtain failure, water pipe rupture and water pipe blockage; (2) the power and network of the Data Center Facility to detect out of ordinary circumstances, including power outages, tripping, network outages, and network and power instability, and Service Provider shall notify the Data Center Facility's management personnel in writing upon the occurrence and ensure they respond in a diligent professional manner; and (3) the temperature of miner rooms to timely eliminate potential risks, including resulting from severe or abnormal temperatures and weather conditions, and Service Provider shall be responsible for responding in a diligent professional manner to any such conditions.

6.2    <u>Power Supply Requirements</u>:

(a)    The power load provided by Service Provider shall satisfy the requirements of this Agreement and standard operational conditions. In the event that the power load is insufficient for any reason (including damage to power supply equipment, insufficient supply from the power supplier, or policy changes at the location of the Data Center Facility), Service Provider shall notify BITMAIN immediately and in any case within 24 hours of any such power reduction including providing the reasons for such power reduction, the duration of the power reduction and the expected time for the power to be restored. Following the power reduction, BITMAIN shall be entitled to reduce the Hosting Quantity of the Hosted Servers and Service Provider shall (1) cooperate with BITMAIN to move the de-racked Hosted Servers out of the server room; and (2) adjust the Deposit or Prepayment, as applicable, in accordance with the reduced Hosting Quantity and repay the difference between the pre-adjustment Deposit or Prepayment, as applicable, and the post-adjustment Deposit or Prepayment, as applicable, to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity.

(b)    If a power reduction is caused by damage to the power supply equipment or other infrastructure within the Data Center Facility, Service Provider must repair the equipment and infrastructure and restore the power to satisfy the requirements of this Agreement within seven (7) calendar days, failing which, Service Provider shall pay BITMAIN the Mining Proceeds for the entirety of the power restriction period beginning from day one (1) of the power reduction until such power reduction is resolved and the power to the Data Center Facility satisfies the requirements of this Agreement. If Service

Provider fails to restore power to the Data Center Facility to satisfy the requirements of this Agreement within fourteen (14) calendar days, BITMAIN may elect to partially or fully terminate this Agreement in its sole discretion following such fourteen (14) calendar day period and Service Provider shall pay BITMAIN the Mining Proceeds for the entirety of the power restriction period beginning from day one (1) of the power reduction under this Section 6.2(b) until the partial or full termination of this Agreement, as applicable. For the avoidance of doubt, the calculation of the Online Status Ratio for purposes of Section 6.11 shall not be adjusted for any power reduction under this Section 6.2(b).

(c)    If a power reduction is caused by a government directive, Governmental Order or load limitation program implemented by a Governmental Authority or relevant power supplier, provided that such compulsory power reduction is not caused by Service Provider (including as a consequence of a breach of any Government Order or the Power Purchase Agreement by Service Provider), Service Provider shall notify BITMAIN of such compulsory power curtailment and provide evidence of such power curtailment acceptable to BITMAIN at its sole discretion acting reasonably within twenty-four (24) hours. If Service Provider fails to provide notification and supporting documentation as required under this Section 6.2(c), Service Provider shall pay BITMAIN the Mining Proceeds from the beginning of the power reduction under this Section 6.2(c) until the supporting documentation is provided to BITMAIN. If the power reduction is not resolved and power restored to the Data Center Facility to satisfy the requirements of this Agreement within fourteen (14) calendar days of the power reduction under this Section 6.2(c), BITMAIN may elect to partially or fully terminate this Agreement in its sole discretion following such fourteen (14) calendar day period.

(d)    If an increase in the Service Provider's electricity costs occurs during the Term resulting in the Service Provider's electricity costs on a kWh basis exceeding the Settlement Hosting Unit Price (a "**High Electricity Rate Period**"), then Service Provider shall provide supporting documentation confirming such price increase to BITMAIN within twenty-four (24) hours of such price increase before reducing the power below the requirements of this Agreement. If Service Provider reduces the power to levels below the power requirements under this Agreement and it is determined that Service Provider's electricity costs during such power reduction period were less than or equal to the Settlement Hosting Unit Price, then Service Provider shall pay BITMAIN the Mining Proceeds from the beginning of the power reduction under this Section 6.2(d) until the power reduction is resolved and the power to the Data Center Facility satisfies the requirements of this Agreement. If the power reduction during a High Electricity Period under this Section 6.2(d) is not resolved and power is not restored to the Data Center Facility to satisfy the requirements of this Agreement within fourteen (14) calendar days of the power reduction under this Section 6.2(d), then BITMAIN may elect to partially or fully terminate this Agreement in its sole discretion following such fourteen (14) calendar day period. For the avoidance of doubt, the calculation

of the Online Status Ratio for purposes of Section 6.11 shall not be adjusted for any power reduction under this Section 6.2(d).

6.3    <u>Exclusive Server Room</u>. Service Provider shall provide exclusive server rooms for the storage and operation of the Hosted Servers, which shall be physically separated from server rooms at the Data Center Facility for use by other customers of Service Provider. No server or other hardware equipment other than the Hosted Servers may be allowed in such exclusive server rooms, unless BITMAIN provides its prior written consent. Service Provider shall separate the Hosted Servers from other servers or hardware equipment and post signage indicating that the server room is exclusively for BITMAIN.

6.4    <u>Monitoring Software.</u> Service Provider shall not interfere, interrupt, delay, degrade, tamper with or discontinue BITMAIN's use of the Monitoring Software or change the settings of any of the Hosted Servers (including their ID settings) and shall provide a dedicated room for the installation of BITMAIN's monitoring servers, a network connection and power supply for BITMAIN to deploy the Monitoring Software. Service Provider shall not update or make any changes to the Monitoring Software or the settings of the Hosted Servers (including their ID settings) without BITMAIN's written consent. If there is a technical failure of the Monitoring Software due to an action or inaction of Service Provider, and the Monitoring Software is not restored within twenty-four (24) hours of such technical failure, then BITMAIN shall be entitled to a payment of the Mining Proceeds for the duration of such failure provided that any fractional day during such period shall be deemed a full day for the calculation of the payment of the Mining Proceeds hereunder.

6.5    <u>Standard Hosting Environment</u>. Service Provider shall maintain the standard hosting environment for the Hosted Servers in accordance with Appendix I.

6.6    <u>Access to Data Center Facility</u>. Service Provider will, during the Term, and upon termination or expiry of this Agreement for any reason, provide, or arrange for, unfettered access, at the Service Provider's cost, to any Data Center Facility, including via any service roads, easements, private roads, or other rights of way and shall not obstruct BITMAIN from removing all or any portion of the BITMAIN Property.

6.7    <u>Safety and Security</u>. Service Provider shall use Industry Practices and install all necessary equipment, to ensure the safety and security of the BITMAIN Property against loss or damage of any kind, including but not limited to, theft, fire, dust or sand ingress, water ingress or snow ingress.

6.8    <u>Compliance with Applicable Law</u>. Service Provider shall ensure that the operation of the Data Center Facility, the conduct of the Service Provider's Representatives, and the provision of the Services is at all times in compliance with Applicable Laws and that any and all applicable approvals, certificates, orders, authorizations, permits, qualifications and consents required for the operation of the Data Center Facility and provision of Services have been obtained no later than the Facility Approval Date and are not revoked, cancelled or expired during the Term. It is Service Provider's sole responsibility to maintain a safe work environment at the Data Center Facility, free from hazards

and compliant with Applicable Laws including, for greater certainty, any applicable health and safety laws and regulations. Service Provider covenants to maintain a safe work environment at the Data Center Facility and any other facility necessary for the functioning of the Data Center Facility. In the event that BITMAIN Personnel require access to the Data Center Facility in accordance with this Agreement, Service Provider shall organize and provide, at Service Provider's cost, all necessary safety training prior to access. Service Provider shall comply with all the safety requirements under the Applicable Laws, including, the federal Occupational Safety and Health Act ("**OSHA**", if applicable), as well as any similar state or local laws and shall be responsible for any and all liability resulting from any conditions at the Data Center Facility, whether existing now or arising in the future, including but not limited to conditions related to health, safety or accessibility, as well as any actions needed to abate such conditions in accordance with all Applicable Laws.

6.9    <u>24/7 Access by BITMAIN Personnel</u>. Unless otherwise agreed by the Parties, BITMAIN and any third parties designated by BITMAIN at its sole discretion, if any (collectively, the "**O&M Service Provider**") shall be responsible for the operation, maintenance and security of the Hosted Servers. The O&M Service Provider and any one or more individuals that it may appoint (collectively, the "**BITMAIN Personnel**") shall carry out operation, maintenance and security activities for BITMAIN on the Hosted Servers onsite at the Data Center Facility on a 24-hour per day, 7-day per week basis. Service Provider shall:

(a)    provide all necessary support and cooperation for the operation, maintenance and security of the Hosted Servers by BITMAIN Personnel;

(b)    provide commercially reasonable assistance to BITMAIN and BITMAIN Personnel in relation to required visa applications for BITMAIN Personnel to provide the operation, maintenance and security services by confirming the commercial relationship between BITMAIN and Service Provider and issuing on-site permits for BITMAIN Personnel, and other related items reasonably requested by BITMAIN;

(c)    grant BITMAIN Personnel access into the Data Center Facility; and

(d)    permit BITMAIN Personnel to access and enter the Data Center Facility and related Premises on a 24-hour per day, 7-day per week basis to:

(i)    obtain operational data from the Hosted Servers;

(ii)    inspect the conditions at the Data Center Facility to confirm compliance with this Agreement;

(iii)    inspect the Data Center Facility to ensure the safety of BITMAIN Property;

(iv)    perform maintenance on or repair the Hosted Servers as necessary in BITMAIN's opinion; and

(v)    inspect and confirm the inventory of the Hosted Servers and Inventory Assets.

Any action or omission of BITMAIN Personnel shall not (x) relieve or impact Service Provider's obligations under this Agreement or any other agreements, including any agreements with third parties; or (y) be considered supervision by BITMAIN of Service Provider.

BITMAIN Personnel may report to Service Provider any unsafe or improper conditions or practices observed at the Data Center Facility for correction by Service Provider. Service Provider shall promptly, and within 30 calendar days or as otherwise agreed to between the Parties, correct all such unsafe or improper conditions or practices reported by BITMAIN Personnel.

6.10    Operations and Maintenance Agreement. If BITMAIN enters into an agreement with Service Provider where Service Provider provides the operation and maintenance services to the Hosted Servers, which for clarity is not the Collaboration Sale Agreement or Collaboration Agreement, BITMAIN shall have the right to terminate such agreement for such operation and maintenance services with Service Provider if:

(a)    the Monthly Average Online Qualified Ratio of Hosted Servers in any one Billing Period is lower than 97% (except the first month);

(b)    the Monthly Average Online Qualified Ratio of Hosted Servers is lower than 99.5% for two consecutive months; or

(c)    a breach of Section 6.17 hereof.

To the extent that there is an executed agreement for operation and maintenance services to the Hosted Servers, the terms of that agreement shall prevail in the event of a conflict with this Section 6.10.

6.11    Online Status Ratio.

(a)    Service Provider shall ensure that the Online Status Ratio in each Billing Period is no less than 95%, excluding any deficiencies with the Online Status Ratio solely as a result of defects in the Hosted Servers or the inappropriate operation of the Hosted Servers by BITMAIN Personnel.

(b)    If the Online Status Ratio for any Billing Period is less than 95% due to any substandard condition of the Data Center Facility, including power connection, network connection, heat dissipation, water purification or other infrastructure, Service Provider shall have a period of one (1) month to remedy such substandard condition (the "**Remedial Period**"). For greater certainty, the calculation of the Online Status Ratio for purposes of this Section 6.11 shall not be adjusted for any power curtailment, power restriction or power outage due to any reason, including any event of Force Majeure.

(c)    If the Online Status Ratio for the Billing Period following the Remedial Period is less than 95%, BITMAIN shall be entitled to (i) immediately terminate this Agreement; or (ii) reduce the Actual Hosting Unit Price so that the Actual

Hosting Unit Price for such Billing Period shall be the product of the current Actual Hosting Unit Price which has been adjusted pursuant to Section 3.2 multiplied by the result of 100% minus (95% minus the Online Status Ratio immediately after the Remedial Period) . Notwithstanding the foregoing, the Actual Hosting Unit Price after further reduction shall not fall below the lower of (1) Minimum Hosting Unit Price; or (2) 85% of the Wholesale Hosting Unit Price, or, following the end of the Discount Repayment Period, the Settlement Hosting Unit Price.

6.12    Inventory Storage and Test Site. In addition to the exclusive server room for the Hosted Servers under Section 6.3, Service Provider shall also provide (a) a dedicated space to BITMAIN for storage and safe keeping of Inventory Assets, that is separate and apart from the storage space allocated to Service Provider and all other Persons and clearly marked as the "*BITMAIN Storage Space*"; and (b) a test site suitable for the operation and maintenance of the Hosted Servers and compliant with all Industry Standard safety and security requirements which test site shall include a 380V – 450V power supply and necessary network access and shall have at least 5 power outlets and 5 network interfaces for use by BITMAIN Personnel.

6.13    Installation and Accuracy of Separate Meter. Service Provider shall install Separate Meters at the Data Center Facility at Service Provider's sole cost and expense to monitor the electrical power consumed by the Hosted Servers and shall cooperate with BITMAIN to check and calibrate the accuracy of the Separate Meters regularly or in accordance with BITMAIN's request, to ensure the constant accuracy of the Separate Meters. The Separate Meters shall be installed in accordance with Exhibit A of Appendix I or as otherwise agreed to between the Parties.

6.14    Inventory Audit. BITMAIN shall be entitled to conduct inventory audits of the Hosted Servers and Inventory Assets regularly or upon BITMAIN's request, and Service Provider shall provide reasonably assistance and cooperation. If the result of the inventory audit does not match the information as stipulated in Appendix I, Service Provider shall cooperate with BITMAIN's investigation to determine the root cause of the discrepancy.

6.15    Health and Safety Manual.  Service Provider shall prepare, maintain, periodically revise and implement with all persons at the Data Center Facility, all Industry Standard written operating, maintenance, safety (including the Health and Safety Manual) and other programs and procedures, including response plans for possible Emergency situations.

6.16    Notice of Damage or Infringement. Service Provider shall, promptly notify BITMAIN in writing, and take all such steps as may reasonably be required by BITMAIN, if Service Provider becomes aware of any actual or suspected damage, infringement, or violation of BITMAIN's Intellectual Property Rights in and to the Hosted Servers.

6.17    Data Center Facility. Service Provider will not move or relocate any Hosted Servers from the Data Center Facility or from the Premises (as defined in the Lease Agreement), assign its Data Center Facility lease, sublease the Data Center

Facility to any Person, or otherwise materially change its interests to the use of the Data Center Facility without the prior written approval of BITMAIN.

6.18    <u>Restrictions re BITMAIN Property.</u> Under no circumstances (including, without limitation, due to any disputes relating to Hosting Fees or purported breaches of this Agreement) will Service Provider redirect the hash power of the Hosted Servers to its own mining pool or any mining pool not authorized in writing by BITMAIN, operate (power-on or power-off) the Hosted Servers without BITMAIN's written consent, remove any BITMAIN Property from the Data Center Facility without the written consent of BITMAIN, resell the BITMAIN Property or any part thereof, grant any interest to the BITMAIN Property or take any other actions that may interfere with BITMAIN's legal and beneficial ownership, operation or monitoring of the Hosted Servers and other BITMAIN Property. A breach by Service Provider of this Section 6.18 shall require Service Provider to pay to BITMAIN the Mining Proceeds for the applicable period that the breach continues.

6.19    <u>Change of Control Transaction.</u> Service Provider shall provide BITMAIN notification at least 21 days prior to any contemplated Change of Control Transaction. BITMAIN's consent, not to be unreasonably withheld, shall be required for completion of any Change of Control Transaction. If Service Provider fails to provide such notification, or BITMAIN does not consent to such Change of Control Transaction, BITMAIN shall have the right to terminate this Agreement without any liability to the Service Provider.

6.20    <u>Data Center Facility Staff.</u> Service Provider shall provide BITMAIN with at least seven (7) days prior written notification of termination, or a material change in role or responsibilities, of any Data Center Facility Staff. If such termination or change in role or responsibilities of any Data Center Facility Staff is not at the election of the Service Provider, then Service Provider shall notify BITMAIN of such termination or change promptly within 24 hours of Service Provider's Knowledge of same.

6.21    <u>Waiver of Hearing Prior to Immediate Possession.</u> In the event that BITMAIN seeks a court order for immediate possession of BITMAIN Property, Service Provider may be entitled to a hearing prior to the repossession of such BITMAIN Property. Service Provider hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any and all of its right to a hearing, prior to the repossession by BITMAIN of the BITMAIN Property or to engage in any action interfering with BITMAIN's ability to seek such court order for immediate possession.

## 7.    <u>INSURANCE</u>

7.1    Service Provider shall obtain and keep in force throughout the Term (and for any such longer period as expressly specified herein) the insurance coverages specified below ("**Required Insurance**"):

(a)    Commercial General Liability Insurance ("**CGL Insurance**"): Insurance covering claims for bodily injury, property damage (including without limitation damage and resulting loss of use to Hosted Servers), personal injury

and advertising injury with limits not less than $2,000,000 per occurrence and $4,000,000 per annum, in the aggregate. Terms and conditions for required CGL Insurance shall be based upon the Insurance Services Office, Inc.'s occurrence based commercial general liability coverage form *[CG 00 01 04 13]* and include: (i) a completed operations coverage maintained for at least three (3) years after the termination or expiration of the Agreement; (ii) blanket contractual liability; (iii) personal and advertising injury coverage; and (iv) broad form property damage.

(b)    Excess/umbrella liability insurance ("**Umbrella Insurance**"): Insurance covering all services performed under this Agreement. Such Umbrella Insurance shall be written on an occurrence basis and shall follow the form of, and provide coverage as broad as, the terms and conditions of the underlying CGL Insurance, with limits not less than $5,000,000 per occurrence and per annum, in the aggregate.

(c)    Comprehensive crime/all risk insurance ("**Crime Insurance**") with limits not less than $1,000,000 per occurrence to provide coverage for loss of property (including without limitation Hosted Servers), money, securities or cryptocurrency in Service Provider's care, custody or control. Such Crime Insurance shall include employee theft and vandalism, embezzlement, inside/outside premises, in-transit for theft, robbery or burglary of money, securities or property, social engineering fraud, funds transfer fraud and third-party fraud.

7.2    Required Insurance shall be with licensed insurance companies that have a minimum rating of A-- in the latest available Best's Rating Guide, unless otherwise approved by BITMAIN in its discretion.

7.3    BITMAIN and Owners of Hosted Servers (as identified by BITMAIN) shall be named as additional insureds (pursuant to scheduled additional insured endorsements) under all CGL Insurance and Umbrella Insurance, and as loss payee under all Crime Insurance. Service Provider shall provide copies of such endorsements to BITMAIN annually. All additional insured endorsements shall be substantially equivalent to Insurance Services Office, Inc.'s version of the standard endorsement CG 2010 10 01 such that coverage is provided to the additional insured for injury, damage and liability "arising out of" Service Provider's operations. Required Insurance maintained by or on behalf of Service Provider shall be primary and non-contributory to any other insurance available to or self-insurance maintained by BITMAIN or the applicable Owner of Hosted Servers.

7.4    Required Insurance shall include waivers of subrogation in favor of BITMAIN and the applicable Owner of Hosted Servers.

7.5    Required Insurance policies shall not contain any exclusions for acts of terrorism, and shall fully cover any acts of terrorism, irrespective of whether such acts of terrorism are caused by domestic, foreign or foreign state-sponsored terrorists, and irrespective of whether such acts of terrorism are certified or non-certified by any Governmental Authority including the United States Secretary of the Treasury, in concurrence with the United States Secretary of State and the

Attorney General of the United States, to be an act of terrorism pursuant to the United States *Terrorism Risk Insurance Act of 2001* ("**TRIA**").

7.6    On or prior to the Effective Date, or within thirty (30) days of BITMAIN's request, Service Provider shall deliver to BITMAIN certified and unredacted copies of insurance policies evidencing that all coverage is compliant with the requirements of this Article 7.

7.7    If any Required Insurance policies contain a deductible or self-insured retention, Service Provider shall be responsible for such deductible or self-insured retention, as applicable under the terms of the relevant insurance policy. BITMAIN shall have the right to approve, in its discretion, any deductible or self-insured retention over $50,000.

7.8    All Required Insurance policies shall provide written notice of cancellation to BITMAIN at least thirty (30) days prior to any cancellation or non-renewal by insurer, except that ten (10) days written notice shall be sufficient if cancellation is for non-payment.

7.9    Nothing contained in this Article 7 shall limit Service Provider's liability or the availability of its insurance for damage or injury, including death, or any other claim which arises out of or relates to any actions, omissions or obligations of Service Provider under the Agreement or under Applicable Law.

7.10    All Required Insurance shall contain liberalization clauses stating that each insurance policy shall provide such broader coverage as is required by any change in Applicable Law, or Service Provider shall provide evidence that such clauses are not available. BITMAIN shall not be deemed to have assessed the entire risk that may be applicable to Service Provider under the Agreement, and the insurance requirements in this Article 7 in no way limit Service Provider's obligations to perform the Services required of it under the Agreement, including all indemnification obligations. Service Provider is not relieved of any liability or obligations assumed under the Agreement by reason of its failure to obtain or maintain the Required Insurance.

7.11    To the extent BITMAIN or an Owner of Hosted Servers maintains any insurance in respect of the BITMAIN Property, Service Provider shall diligently and expeditiously cooperate with BITMAIN or Owner of Hosted Servers for any claims made by BITMAIN or Owner of Hosted Servers under such insurance policies and provide all reasonably requested materials and confirmations requested in relation thereto.

## 8.    TITLE AND OWNERSHIP OF HOSTED SERVERS

8.1    Ownership of Hosted Servers.

(a)    Service Provider acknowledges and agrees that BITMAIN or the third party identified by BITMAIN (the "**Owner of Hosted Servers**") holds all right, title, and interest in the Hosted Servers and Inventory Assets, (excluding, for the avoidance of doubt, the Collateral (as defined in the Collaboration Agreement)) (collectively, the "**BITMAIN Property**"), notwithstanding that such

BITMAIN Property, may become attached or affixed to, the Data Center Facility.

(b)     Service Provider hereby waives any statutory or common law lien or right of distress in or to the BITMAIN Property or any part thereof and agrees that BITMAIN may at any time remove the BITMAIN Property from the Data Center Facility.

(c)     Service Provider will not claim any right, title or interest in any of the BITMAIN Property and will not, nor permit any other person directly or indirectly on behalf of the Service Provider to, encumber, lease or otherwise dispose, sell, transfer, salvage or convey any part of the BITMAIN Property, notwithstanding that such the BITMAIN Property may be deemed a fixture or attached to real property and in the event a person claims any interest in the BITMAIN Property, the Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance to confirm the Owner of Hosted Servers' right, title and interest in the BITMAIN Property.

(d)     To the extent permitted by Applicable Law, the Service Provider hereby waives and renounces any right under Applicable Law or equity that Service Provider may have to object to any action, claim, suit, proceeding or demand initiated by BITMAIN, or the appointment of a Bailiff at the request of BITMAIN, for the removal of the BITMAIN Property from the Data Center Facility and confirms and agrees that it will diligently and expeditiously cooperate with BITMAIN for any such removal.

(e)     Owner of Hosted Servers may affix to any or all BITMAIN Property a marker identifying Owner of Hosted Servers as the owner of such BITMAIN Property and Service Provider agrees not to remove or alter any such identifying marker.

(f)     Service Provider shall not obstruct BITMAIN from removing all or any portion of the BITMAIN Property from the Data Center Facility for any reason whatsoever including, without limitation, any outstanding obligations of BITMAIN owing to Service Provider hereunder and Service Provider shall diligently and expeditiously cooperate with BITMAIN for any such removal.

8.2     <u>Transfer of Rights</u>. If the Owner of Hosted Servers transfers all or part of the Hosted Servers to a third party, BITMAIN shall be entitled to assign its rights and obligations under this Agreement associated with such Hosted Servers to such third party purchaser on the same terms. Service Provider shall execute the relevant documentation as necessary or as reasonably requested by such third party, and provide corresponding assistance, including permitting BITMAIN to share all materials in relation to the Data Center Facility that may be requested by such third party.

## 9.    **INDEMNIFICATION**

9.1     Service Provider shall indemnify, defend and hold harmless BITMAIN, its Affiliates and their respective officers, directors, agents, consultants, employees, advisors and other representatives (collectively, the "**BITMAIN Indemnitees**") from and against all liabilities and losses (including, any third-party action, claim,

suit, proceeding, demand, investigation, or charge alleging any costs, losses, liabilities, damages, fines, judgments, fees, or expenses, legal fees and costs, and loss of profits (which calculations shall use Mining Proceeds when calculating the loss of profits relating to Bitcoin)) directly or indirectly, as a result of, based upon, arising out of or in connection with Service Provider's:

(a)     negligence, fraud or willful misconduct;

(b)     failure to comply with Applicable Law;

(c)     failure by Service Provider to provide BITMAIN access to the Data Center Facility to remove the Hosted Servers;

(d)     breach of its covenants under Sections 6.4, 6.6, 6.17, 6.18 and 6.21;

(e)     breach of this Agreement other than the breaches set forth above, including the Service Provider covenants and performance of the Services, whether by act or omission; or

(f)     loss or damage, degradation, destruction, or alteration of the BITMAIN Property, which damages shall include, in addition to the loss of profits, the current market value of the BITMAIN Property in the condition as supplied on the applicable delivery date of such BITMAIN Property to the Data Center Facility; or

(g)     infringement, violation or misappropriation of the BITMAIN Property or the Hosted Servers as a result of, or related to, actions or omissions of the Service Provider or any persons who received access to the BITMAIN Property or the Hosted Servers through the Service Provider, including reverse engineering of the BITMAIN Property or the Hosted Servers, or the combination, operation, modification, or use of the BITMAIN Property or the Hosted Servers other than as permitted by this Agreement.

9.2     In addition to the remedies available to BITMAIN under Section 9.1, BITMAIN may, in BITMAIN's sole discretion:

(a)     in the event of Service Provider's failure to perform the Services, BITMAIN may itself perform the Services or have them performed by a qualified third party and charge the Service Provider for the cost of such Services;

(b)     seek equitable remedies including injunctive relief;

(c)     discontinue any payments to Service Provider under this Agreement, without liability, until such breach is cured; and

(d)     withhold the whole or part of any payments due to Service Provider under this Agreement until such breach is cured.

9.3     The indemnified Party shall, without undue delay, notify the indemnifying Party following receipt of any written notice setting out any third party claims against the indemnified Party. Any delay by indemnified Party to notify the indemnifying Party shall not relieve the indemnifying Party from any obligation to indemnify

Docusign Envelope ID: 5E393DA5-0CDA-4532-B78B-A9B9C9C51135

hereunder unless the delay in notification forfeits defences available to the indemnified Party or any BITMAIN Indemnitees. The indemnifying Party may participate in the investigation and defence of any third-party claim and assume the investigation and defence of any third-party claim upon written consent of the indemnified Party. The indemnifying Party may not compromise and settle or remedy, or cause a compromise and settlement or remedy, of a third-party claim without the prior written consent of the indemnified Party, which consent may not be unreasonably withheld or delayed.

## 10.    <u>LIMITATIONS OF LIABILITY</u>

10.1    BITMAIN shall not be liable to the Service Provider for special, indirect, consequential, exemplary or punitive damages, loss of business, loss of profits or loss of revenue, arising out of or related to this Agreement, regardless of the cause of action, whether in contract, negligence, tort or otherwise, even if BITMAIN has been advised of the possibility of such damages.

10.2    BITMAIN shall not be liable to the Service Provider for damages and all losses, liabilities, damages, costs (including taxes), and all related expenses, including reasonable legal fees and disbursements and costs of investigation, litigation and settlement, together with interest and penalties, arising under this Agreement, regardless of the theory of liability, and whether or not arising in contract, tort or otherwise, exceeding, in the aggregate the total Hosting Fees paid by BITMAIN hereunder during the six (6) months immediately preceding a claim for such damages and losses.

10.3    <u>Payments for breaches</u>. Service Provider's or any agent, subcontractor or representatives of Service Provider's:

(a)    breach of Section 6.6, Section 6.9 or Section 6.20 shall result in an obligation of Service Provider and any successor thereto to pay BITMAIN one (1) month of the Monthly Theoretical Hosting Fees for each such breach such amount due and payable within seven (7) calendar days of each such breach;

(b)    breach of Section 6.17 or Section 6.19 shall result in an obligation of Service Provider and any successor thereto to pay BITMAIN three (3) months of the Monthly Theoretical Hosting Fees for each such breach such amount due and payable within seven (7) calendar days of each such breach;

(c)    breach of Section 6.18 shall result in an obligation of Service Provider and any successor thereto to pay BITMAIN the Mining Proceeds for the duration of the breach such amount due and payable within seven (7) calendar days of each such breach and BITMAIN shall have no obligation or liability to pay the Hosting Fees due hereunder for the duration of such breach.

10.4    <u>Payments not Penalty</u>. Service Provider hereby acknowledges that the payments due under Section 6.2, Section 6.4, Section 6.18, Section 10.3, Section 13.2, Section 13.3, and elsewhere in this Agreement, constitute compensation and are not a penalty. The Service Provider further acknowledges and agrees that any amounts payable under this Agreement will not have the effect of placing BITMAIN in a better position than if Service Provider fully performed its

obligations hereunder and are not unconscionable or extravagant. Service Provider hereby waives, to the extent permitted by Applicable Law, any defenses available to Service Provider at law or equity in respect of any action, claim, suit, proceeding or demand initiated by BITMAIN for the payment of the amounts due under this Agreement as being unenforceable.

10.5    Other than in respect of the Service Provider's indemnification obligations in Section 9.1(a), 9.1(b), 9.1(c), 9.1(d), 9.1(f) or 9.1(g) of this Agreement, or the Service Provider's breach of Articles 5, 8 or 14, Service Provider shall not be liable to BITMAIN for damages and all losses, liabilities, damages, costs (including taxes), and all related expenses, including reasonable legal fees and disbursements and costs of investigation, litigation and settlement, together with interest and penalties, arising under this Agreement, regardless of the theory of liability, and whether or not arising in contract, tort or otherwise, exceeding, thirty-six times (36x), in the aggregate, the Monthly Theoretical Hosting Fee.

10.6    <u>Cumulative Remedies.</u> The rights and remedies of the parties hereunder are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise. No single or partial exercise by a party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that party may be entitled. Unless expressly stated otherwise herein, any amounts payable hereunder to BITMAIN by Service Provider, such as the payment of Delay Compensation, Monthly Theoretical Hosting Fees, Mining Proceeds, Theoretical Hashrate PPS Income as a result of a breach, termination or otherwise, shall not be considered liquidated damages and shall be payable in addition to all other damages and remedies that BITMAIN may have at law or equity.

## 11.    <u>PARENT GUARANTEE</u>

**12.    <u>The Service Provider Parent unconditionally and irrevocably guarantees, and covenants and agrees to be jointly and severally liable with the Service Provider for, the due and punctual performance of each and every obligation of the Service Provider arising under this Agreement and shall provide the Service Provider Parent to BITMAIN in the form attached hereto in Appendix V. In the event that, Service Provider Parent, Fenshou Chen no longer controls OLD CONST LLC, whether through a sale of shares, transfer of ownership interests, or any other means, the Service Provider should provide an alternative reliable guarantee at least 21 days prior to any anticipated Change of Control Transaction or at least 21 days prior to the loss of Mr. Fenshou Chen's control over OLD CONST, whichever occurs earlier. The guarantee provided by Service Provider Parent, Fenshou Chen may be replaced by the new guarantee, subject to BITMAIN's written consent.FORCE MAJEURE</u>**

Except as otherwise stated herein, a Party shall not be considered to be in default or breach of this Agreement and shall be excused from performance, if and to the extent that the performance of any obligation of such Party under this Agreement is prevented, frustrated, hindered or delayed as a consequence of an event of Force Majeure, provided that such Party claiming an event of  Force Majeure (the "**Affected Party**") shall give the other Party (the "**Non-Affected Party**") a written notice within 24 hours setting out

the details of such Force Majeure; and, if the Hosted Servers are unable to be operated as required herein as a result of an event of Force Majeure, then, Service Provider has waived BITMAIN's Hosting Fees for the duration of such Force Majeure. If the normal performance of this Agreement is not resumed within fourteen (14) calendar days from the occurrence of such event of Force Majeure or cannot be resumed, in the sole discretion of BITMAIN, within such fourteen (14) calendar day period, BITMAIN shall be entitled to terminate this Agreement with immediate effect.

**13.    TERM AND TERMINATION**

13.1    Term. This Agreement shall have a term (the "**Term**") as specified in Appendix I.

13.2    Termination. This Agreement may be terminated prior to the expiration of the Term:

(a)    upon agreement in writing of the Parties;

(b)    Service Provider may terminate this Agreement:

(i)    if BITMAIN fails to pay fees invoiced by Service Provider in accordance with this Agreement and fails to cure such non-payment within thirty (30) days of notice by Service Provider; or

(ii)    in accordance with Section 3.4(c)(ii), provided that BITMAIN shall pay Service Provider an amount equal to one (1) month of Monthly Theoretical Hosting Fees upon such termination, subject to Service Provider's compliance with Section 3.4(c)(ii); or

(iii)    following expiry of the Voluntary Power-off Period in accordance with Section 5.5.

(c)    BITMAIN may terminate this Agreement:

(i)    if Service Provider commits a material breach (or repeated breaches which regardless of whether the breaches are cured, cumulatively constitute a material breach) of this Agreement and (1) the breach is incapable of being cured; or (2) Service Provider fails to cure such breach within thirty (30) days of notice of such breach. In the event of termination pursuant to this Section 13.2(c)(i), Service Provider shall pay BITMAIN an amount equal to one (1) month of Monthly Theoretical Hosting Fees, in addition to any other items payable pursuant to this Agreement by Service Provider to BITMAIN, upon such termination;

(ii)    at any time upon (A) written notice of sixty (60) days to the Service Provider; or (B) written notice of thirty (30) days to the Service Provider together with a payment to the Service Provider of an amount equal to one (1) month of Monthly Theoretical Hosting Fees;

(iii)    effective immediately, if Service Provider: (1) is dissolved, liquidated, or wound-up or takes any corporate action for such purpose; (2) becomes insolvent or is generally unable to pay its debts as they

become due; (3) becomes the subject of any voluntary or involuntary bankruptcy proceeding under any federal or foreign bankruptcy or insolvency Applicable Law; (4) makes or seeks to make a general assignment for the benefit of its creditors; or (5) applies for, or consents to, the appointment of a trustee, receiver, receiver-manager, or custodian for all or a substantial part of its property; or

(iv)   effective immediately, if Service Provider is in breach of Sections 4.1, 4.2(e), 4.2(g), 5.2, 6.4, 6.6, 6.9, 6.13, 6.14, 6.17, 6.18, 6.19, 6.20 and 8.1(c) and such other sections that expressly permit Service Provider to terminate this Agreement with immediate effect; or

(v)   as otherwise permitted under this Agreement.

13.3   <u>Effects of Termination</u>. Upon termination or expiry of this Agreement, without limiting any other provisions set forth in this Agreement or the Collaboration Agreement:

(a)   Service Provider shall promptly (no later than five (5) Business Days after such termination or expiry):

(i)   pay to BITMAIN an amount equal to: (1) any remaining Deposit, Prepayment and Balance; and (2) any Delay Compensation, Monthly Theoretical Hosting Fees, Mining Proceeds or Theoretical Hashrate PPS Income payable in accordance with this Agreement;

(ii)   provide access to any Data Center Facility to retrieve the Hosted Servers and BITMAIN Property, in accordance with Section 6.6;

(iii)   in the event of Service Provider's failure to provide BITMAIN access to the Data Center Facility to remove the Hosted Servers, pay liquidated damages in the amount of the Mining Proceeds for each day that access is not provided, which the Parties hereby agree are reasonable and proportionate to the anticipated damages resulting from such failure to provide access and is not a penalty;

(iv)   invoice the Hosting Fees for the unpaid Billing Period until the date of termination in accordance with Section 3.7(a);

(v)   return all Confidential Information of BITMAIN to BITMAIN and delete all electronic copies thereof from its systems.

(b)   BITMAIN shall:

(i)   pay all undisputed invoiced amounts in accordance with this Agreement; and

(ii)   return all Confidential Information of Service Provider to Service Provider and delete all electronic copies thereof from its systems.

13.4   <u>Survival</u>. Neither the expiration nor the termination of this Agreement will release either of the Parties from any obligation or liability that accrued prior to

such expiration or termination. The following provisions of this Agreement will survive the expiration or termination of this Agreement: Sections 6.3, 6.4, 6.6, 6.8, 6.9, 6.12, 6.14, 6.17, 6.18, 6.21, Article 8, Article 9, Article 10, Article 11, Section 13.3, this Section 13.4, Article 14, Article 17 and such other provisions that by their nature are intended to survive termination or expiration of this Agreement.

## 14.    CONFIDENTIALITY

14.1    In connection with each Party's rights and obligations under this Agreement, each Party (the "**Disclosing Party**") may disclose to the other Party (the "**Receiving Party**"), including such Party's directors, officers, employees, professional advisors, agents and other Persons acting on their behalf (collectively such Party's, "**Representatives**") certain of its confidential or proprietary information, including Personal Information and this Agreement ("**Confidential Information**"). Receiving Party agrees to exercise at least the same degree of care to safeguard Confidential Information of Disclosing Party as Receiving Party exercises to safeguard the confidentiality of its own confidential information, but not less than reasonable care. The Receiving Party agrees that it shall not, except to the extent required by Applicable Law or any Governmental Authority having jurisdiction, disclose, communicate, provide, or otherwise make available the Confidential Information to any entity, Person, firm or corporation.

14.2    Exclusions. The obligations of the Receiving Party pursuant to this Agreement shall not extend to information that the Receiving Party can establish by written evidence: (a) is or that becomes publicly known through no wrongful act of the Receiving Party; (b) is properly made available to the Receiving Party without confidential or proprietary restriction from a source other than the Disclosing Party or the Disclosing Party's Affiliates; (c) that the Receiving Party can show was rightfully in its possession without obligation of confidentiality; (d) information which is approved by the Disclosing Party for disclosure in a written document which is signed by a senior officer of the Disclosing Party; or (e) that is independently developed without reference to the Disclosing Party's Confidential Information.

14.3    Permitted Disclosures. A Receiving Party may disclose Confidential Information of the Disclosing Party to: (a) its Affiliates and their Representatives to the extent necessary to perform their obligations under this Agreement, provided that such Receiving Party shall ensure such Persons are subject to the confidentiality obligations at least as burdensome as those contained herein; (b) as required by Applicable Law or Governmental Authority, Governmental Order, or as part of a legal process, provided that prior to any such disclosure, the Receiving Party shall promptly notify the Disclosing Party in writing, unless prohibited by Applicable Law, and reasonably cooperate with the other Party to avoid or limit such disclosure to the extent legally permitted, and to obtain a protective order or other available protections to the extent such disclosure is required; (c) with the prior written consent of the Disclosing Party; or (d) solely with respect to BITMAIN, its Partner Entities so long as such Persons are subject to the confidentiality obligations at least as burdensome as those contained herein.

14.4    <u>Injunctive Relief.</u> The Parties acknowledges that a breach or threatened breach of this Section may cause serious and irreparable harm to the Disclosing Party for which monetary damages may not be a sufficient remedy. In the event of a breach or threatened breach of this Section, the Disclosing Party may seek injunctive relief.

## 15.    <u>NOTICES</u>

15.1    All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be delivered in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the Parties at the addresses specified below or such other address a Party may specify in writing to the other Party from time to time. Any such notice or other communication shall be deemed delivered on the day on which it was sent in the case of electronic mail (or, if such day is not a Business Day, on the next following Business Day) or on the date it is delivered as evidenced by such mail or carrier method.

**To Service Provider: See Appendix I.**

**To BITMAIN:**

Address:    [900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA
Attn:    [Bitmain Legal Department]
Email:    [legal@bitmain.com and invoice@bitmain.com]

## 16.    <u>ANTI-COMMERCIAL BRIBERY</u>

16.1    Service Provider shall not, and shall ensure its Representatives will not to, directly or indirectly, engage in any activity of commercial bribery; or provide any unjustified interests in any form including cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service to any Representative of BITMAIN in order to obtain, entice or commence any immediate or future business opportunity with BITMAIN, regardless of whether such actions are in response to explicit or implicit request of BITMAIN or the Representatives of BITMAIN (which the Service Provider will notify BITMAIN of). In the event of a breach of this Article, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Service Provider.

## 17.    <u>GENERAL</u>

17.1    <u>Entire Agreement</u>. This Agreement and the other agreements referenced herein, together with all appendices, schedules, annexes and exhibits, hereto and thereto

constitutes the full and entire understating and agreement between the Parties and supersedes all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof.

17.2 <u>Amendment</u>. This Agreement may not be modified except in writing signed by authorized Representatives of each Party.

17.3 <u>Assignment</u>. BITMAIN may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party. Service Provider may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part, provided Service Provider has obtained BITMAIN's prior written consent and such assignment also assign's the Service Provider's rights under the Collaboration Sale Agreement and the Collaboration Agreement. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

17.4 <u>Overdue Amounts</u>. In addition to any amounts owing hereunder by Service Provider to BITMAIN and in addition to all other damages and remedies that BITMAIN may have at law or equity, all overdue payments owing by Service Provider to BITMAIN hereunder shall accrue interest on the amount overdue at a rate of 1% per calendar month until paid in full.

17.5 <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws. The Parties hereby irrevocably submit to the exclusive jurisdiction of the courts of the Relevant Jurisdiction for the purpose of any proceeding arising out of this Agreement. This Agreement expressly excludes and disclaims the terms of the UN Convention on Contracts for the International Sale of Goods, which Convention will not apply to any transaction under this Agreement.

17.6 <u>Dispute Resolution Process</u>. In the event of any dispute or disagreement between the Parties related to this Agreement or any schedule or attachment ("**Dispute**" or "**Disputed**"), upon the written request of either Party, the Parties will meet for the purpose of resolving such Dispute. The Parties agree to, in good faith, attempt to informally resolve such Dispute promptly and in an amicable manner ("**Informal Dispute Resolution**"). Both Parties shall continue performing their respective obligations under this Agreement while any Dispute is being resolved. If the Parties are unable to resolve the Dispute within thirty (30) days through Informal Dispute Resolution, the Parties will:

(a) Except as provided in Section 17.6(c) hereof, submit any dispute, controversy, or claim arising out of or relating to this Agreement, including any breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this provision to arbitrate, to JAMS (Judicial Arbitration and Mediation Services) for binding arbitration in accordance with its Comprehensive Arbitration Rules and Procedures (the "**Comprehensive Rules**"). The arbitration shall be conducted in Houston, Texas, by a single arbitrator appointed in accordance with JAMS rules provided that such arbitrator shall be an attorney admitted to practice law in the State of Texas or a former judge or judges who previously served in the

State of Texas ("**Arbitrator**"). The decision of the Arbitrator shall be final and binding upon the Parties, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof. The Arbitrator shall also decide any issues relating to (i) the making, validity, enforceability, or scope of this arbitration clause; (ii) arbitrability of any issue; (iii) defenses to arbitration, including unconscionability, fraudulent inducement, lack of mutual assent, failure of consideration, capacity, legality, or any similar argument; and (iv) whether the contract or the arbitration provision is voidable.  This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Each party hereby irrevocably and unconditionally waives any and all rights to trial by jury in an action, suit, proceeding or counterclaim arising out of or relating to this agreement or the transactions contemplated hereby, whether based on contract, tort or any other theory. Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this agreement, by, among other things, the mutual waiver and certifications in this section 17.6.

(b)   <u>Confidentiality.</u> Any arbitration proceedings related to this Agreement shall be confidential and any documents or information related to said arbitration (the "**Arbitration Materials**") are Confidential Information and subject to Section 14 of this Agreement. The Arbitration Materials shall include, but are not limited to, any document(s) produced voluntarily or in response to discovery requests; any written discovery response(s); the transcript(s) of any deposition, hearing, conference, or other proceeding; any exhibit(s) shown during any deposition, hearing, conference, or other proceeding or attached to any motion, pleading, or other documents filed, served, or otherwise provided in the arbitration; any pleading(s), including any demand for arbitration or answer to such a demand; any order(s), judgment(s), or other decision(s) of the Arbitrator; any expert report(s) and exhibits thereto; and/or any correspondence, including email correspondence, relating to the arbitration. The Parties shall use Arbitration Materials solely for the purpose of the arbitration. Nothing in this provision shall prevent a Party from applying to a court of competent jurisdiction for an order enforcing a final arbitration award or attaching a final arbitration award to such an application, if required.

(c)   <u>Non-Waiver of Right to Arbitration</u>. The Parties agree that pursuit via litigation of an injunction or a writ of replevin ordering the return of a Party's property or similar relief is not inconsistent with the arbitration provisions in this Section. Service Provider will not oppose BITMAIN's efforts to compel arbitration or otherwise take the position that BITMAIN has waived its right to arbitrate claims arising under this Agreement based on BITMAIN's pursuit via litigation of an injunction or a writ of replevin ordering the return of BITMAIN's property.

(d)   <u>Allocation of Costs.</u> The non-prevailing Party shall bear the reasonable attorneys' fees, costs, and arbitration fees of the prevailing Party.

17.7    <u>Outside Litigation</u>. In the event that the Service Provider initiates or is named as a defendant or other party in any litigation, arbitration or any other formal dispute resolution process relating to the subject of this Agreement to which BITMAIN is not a party ("**Outside Litigation**"), Service Provider agrees to the following:

(a)    Service Provider shall promptly inform BITMAIN of the Outside Litigation.

(b)    If Service Provider initiates Outside Litigation, Service Provider shall consult with BITMAIN prior to the initiation of the Outside Litigation.

(c)    Service Provider shall consult with BITMAIN regarding any litigation activities, including but not limited to motions practice, discovery responses, and settlement agreements, that may impact BITMAIN's ownership interest in the BITMAIN Property.

(d)    Service Provider shall provide BITMAIN a copy of any settlement agreement resolving claims by or against Service Provider in the Outside Litigation and shall not agree to any such settlement without the prior written consent of BITMAIN, which consent may not be unreasonably withheld or delayed provided that BITMAIN's consent shall not be required in respect of any settlement that does not result in any liability, restriction or obligation applicable to BITMAIN or any of the BITMAIN Property or any impact on this Agreement and the Parties obligations herein.

(e)    Service Provider shall not oppose BITMAIN's intervention in the Outside Litigation.

(f)    Service Provider agrees that BITMAIN's intervention in the Outside Litigation will not waive BITMAIN's right to arbitrate any claims under this Agreement.

(g)    Service Provider agrees to indemnify BITMAIN for attorneys' fees, costs, or other expenses BITMAIN incurs in relation to the Outside Litigation**.**

17.8    <u>Severability</u>. If any provision of the Agreement shall be invalid, illegal or unenforceable, only to the extent of such invalidity, illegality or limitation on enforceability without affecting the remaining provisions of this Agreement.

17.9    <u>Relationship</u>. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, fiduciary or employment relationship between the Parties hereto nor shall any Party have the right, power, or authority to create any obligation or duty, express or implied, on behalf of any other Party. The Parties will remain at all times independent contractors. In no event will either Party's employees, agents or subcontractors be considered agents or employees of the other Party.

17.10    <u>Non-Waiver</u>. Any failure by a Party to enforce any term of this Agreement shall not constitute a waiver of such term.

17.11    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute

Docusign Envelope ID: 5E303DA5-0CDA-4532-875E-A9B9C9C51135

one and the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

17.12    <u>Condition Precedent.</u> This Agreement must be entered into by the Parties concurrently with the Parties entering into the Collaboration Agreement and the Collaboration Sale Agreement.

17.13    <u>Waiver of Jury Trial</u>. To the extent permitted by Applicable Laws, each Party hereby waives the right to trial by jury of any such suit, action or proceeding, whether based on contract, tort or any other theory. Each Party certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such Party would not, in the event of any litigation, seek to enforce the foregoing waiver, and acknowledges that it and the other Party has been induced to enter into this Agreement, by, among other things, the mutual waiver and certifications in this Section 17.13.

*[The remainder of this page is intentionally left blank for signature]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

By: _____
    Name:
    Title:

Signed for and on behalf of Service Provider

**OLD CONST LLC.**

By: _____
    *Yizheng Wang*
    E1B3FE6F42B6436...
    Name: Yizheng Wang
    Title: Manager

Signed in respect of its obligations in Article 11:

Signed for and on behalf of Service Provider Parent

**Fenshou CHEN**

By: _____
    *Fenshou Chen*
    BBF805A33DF8FD0...
    Name: Fenshou Chen
    Title: Member



## APPENDIX I
## TERMS OF SERVICES

### 1.    HOSTING CAPACITY AND HOSTED SERVERS

1.1    Service Provider agrees to provide to BITMAIN Hosting Capacity as follows, together with the necessary onsite production and working facilities including office rooms, maintenance rooms, and toilets. The number of the Hosting Quantity shall be determined based on the calculation of each Hosted Server's rated power as 3,600W.

| Hosting Capacity　(MW) | Hosting Quantity (Units) |
|---|---|
| 25 | 7,143 |

1.2    The Parties acknowledge and agree that the actual Hosting Quantity in this instance shall be determined by the actual average power of Hosted Servers. Details of the Hosted Servers hereunder are as follows, subject to the specific model, power efficiency and quantity of the Hosted Servers actually delivered to the Data Center Facility. Service Provider shall ensure that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for each batch of Hosted Servers to be in Online Status on or before the respective Power-On Date as set forth in the table below:

| Batch No. | Model | Power Efficiency (J/T) | Hosting Quantity (Units) | Facility Approval Date | Estimated Delivery date | Power-on Date |
|---|---|---|---|---|---|---|
| 1 | S21 | 17.5 | 3,150 | N/A | November 30, 2024 | 10 days following the delivery date ("**Initial Date**") |
| 2 | S21 | 17.5 | 2,520 | N/A | December 20, 2024 | 10 days following the delivery date |
| 3 | S21 | 17.5 | 1,473 | N/A | Januarary 10, 2025 | 10 days following the delivery date |
| **Total** | | | 7,143 | | - | - |

The quantity and model of the Hosted Servers (initially as set forth herein) are subject to changes from time to time as determined by BITMAIN in its sole discretion.

1.3    The Parties further acknowledge and agree that, subject to the Hosting Capacity and Hosting Quantity, BITMAIN shall be entitled to, from time to time, modify the model of the Hosted Servers and Hosting Quantity, at its sole discretion, by providing written notice (the "**Hosted Servers Modification Notice**") in the form attached

hereto as Exhibit B of this Appendix I prior to the delivery, withdrawal, or replacement of the Hosted Servers.

1.4    Service Provider shall cooperate with BITMAIN to on-rack and/or de-rack of the Hosted Servers, power on additional Hosted Servers as applicable, and adjust the amount of the Deposit and Prepayment in accordance with the calculation methods provided in the Agreement. In the event where there is a decrease in the Deposit or Prepayment, as applicable, Service Provider shall return the difference between the pre-adjustment Deposit or Prepayment, as applicable, and the post-adjustment Deposit or Prepayment, as applicable, in full to BITMAIN in accordance with Section 3.4(e) of the Agreement.

1.5    Shipping of the Hosted Servers. The Hosted Servers shall be shipped to the Data Facility simultaneously with the Products in accordance with the Collaboration Sale Agreement estimated shipping timelines.  The logistics transportation fees, customs clearance fees and insurance costs of the Hosted Servers shall be borne by BITMAIN. BITMAIN shall undertake the risks of any and all losses and damages of its Hosted Servers that may occur during the shipping of its Hosted Servers.

2.    **SERVICE AND FEES**

2.1    Data Center Facility. Service Provider has submitted the Information Memorandum of the Data Center Facility located at 252 TN-140, Puryear, TN 38251, the US attached hereto as Exhibit A.

2.2    Deposit. BITMAIN shall pay to Service Provider the Deposit as set forth below in accordance with the Agreement.

| Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|---|---|---|
| 7,143 | 7,143× 3.6 (kW) × 0.035(US$/kWh)× 24 *(h)* ×30*(d)* | 648,012.96 |

2.3    Hosting Unit Price. The applicable Hosting Fees are as follows:

(a)    Normal Hosting Unit Price (including non-deductible taxes/expenses and the cost of water): US$[0.035]/kWh

(b)    Minimum Hosting Unit Price (including non-deductible taxes/expenses and the cost of water) which shall be approximately equal to Service Provider's cost of electricity: US$[0.035]/kWh

(c)    Settlement Hosting Unit Price (including non-deductible taxes/expenses and the cost of water): US$[0.065]/kWh

(d)    Wholesale Hosting Unit Price (including non-deductible taxes/expenses and the cost of water): US$[0.035]/kWh:

(e)    Monthly Theoretical Hosting Fees are as follows:

Page 43 of 82

<u>During the Discount Repayment Period</u>: US$[648,012.96]

Monthly Theoretical Hosting Fee (including non-deductible taxes/expenses): $\sum$*Rated Power of Each Hosted Server Powered-On (kWh) × Wholesale Hosting Unit Price × 24(h) × 30(d)*

<u>After conclusion of the Discount Repayment Period</u>: US$[648,012.96]

Monthly Theoretical Hosting Fees (including non-deductible taxes/expenses): $\sum$*Rated Power of Each Hosted Server Powered-On (kWh) × Settlement Hosting Unit Price × 24(h) × 30(d)*

2.4    <u>Billing Method.</u>

The selected billing method is as follows:

☐ A. Post-use Payment Billing Method, set out in Section 3.6(a) of the Agreement.

☒ B. Prepayment Billing Method, set out in Section 3.6(b) of the Agreement.

The Prepayment for the initial Billing Period shall be the Deposit. The Prepayment for subsequent Billing Periods shall be the actual Hosting Fee for the preceding Billing Period, as determined according to Section 3.7 of the Agreement. In case of a Dispute regarding the calculation of the Hosting Fee, the Prepayment shall be the amount claimed by BITMAIN and upon settlement of such Dispute, the Prepayment shall be adjusted in accordance with the settlement of the Dispute.

The invoicing and payment for any applicable Billing Period shall be in accordance with Section 3.7 of the Agreement.

2.5    <u>On-rack fees in accordance with Section 3.3 of the Agreement.</u>

☐ A. BITMAIN or a third party designated by BITMAIN shall on-rack the Hosted Servers, and Service Provider shall cooperate and provide necessary assistance to BITMAIN or such third party at Service Provider's sole cost and expense. BITMAIN is not required to pay Service Provider any on-rack fee.

☒ B. Service Provider shall undertake the responsibility of on-racking and powering-on the Hosted Servers, ensuring that a minimum of 600 Hosted Servers is on-racked and powered-on each day. Service Provider may charge BITMAIN an all-inclusive on-rack fee of US$15 per Hosted Server (the "**On-Rack Fee**"). The On-Rack Fee includes all fees and expenses associated with on-racking the Hosted Servers in accordance with the instructions provided by BITMAIN, including, the unloading of the Hosted Servers from the carrier at arrival, placing the Hosted Servers on the racks at the Data Center Facility, powering-on of the Hosted Servers, disposing or storing of wrapping materials as instructed by BITMAIN, and the removal of any waste materials.

☐ C. The combination of A and B and as specified as follows: N/A.

2.6   <u>Off-rack Obligation and Fees</u>. At the termination or expiration of the Agreement or at such other times as agreed between the Parties, BITMAIN shall be entitled to elected between having the Service Provider to off-rack and wrap the Hosted Servers or to off-rack the Hosted Servers itself or using a third party designated by BITMAIN.

If BITMAIN chooses to arrange off-racking using BITMAIN Personnel, BITMAIN is not required to pay Service Provider any off-rack fee. Service Provider shall provide all reasonable cooperation as required by BITMAIN at Service Provider's sole cost and expense.

If BITMAIN chooses to have Service Provider to off-rack the Hosted Servers, Service Provider shall off-rack, dust and wrap the Hosted Servers according to the instructions provided by BITMAIN. Service Provider may charge BITMAIN an off-rack fee (including taxes/expenses), at the rate of US$15 per Hosted Server (the "**Off-Rack Fee**"). It is agreed that the Off-Rack Fee includes all fees and expenses associated with off-racking the Hosted Servers, including, dusting, wrapping, and packaging and loading the off-racked Hosted Servers onto the carrier service designated by BITMAIN. Any such off-rack fee shall be billed per occurrence, subject to the prior written consent of BITMAIN, for the Billing Period during which it occurs.

2.7   <u>Taxes and Expenses</u>.

The Services provided by the Service Provider, or the payment of any amounts made by BITMAIN, are inclusive of all applicable taxes, including sales and use tax, valued added tax and any other similar governmental charges and duties. The Service Provider shall comply with all applicable tax laws, regulations, and associated obligations. The Service Provider shall indemnify and hold BITMAIN harmless from and against any and all liability arising from non-compliance with its tax obligations including, tax filing, claims, late payment interest, fines, penalties in relation to applicable sales and use tax, value-added taxes, excise tax, general business tax and any other governmental taxes, charges and duties connected with the Services or the payment or receipt of any amounts under the Agreement. If the applicable tax laws or regulations change, the resulting taxes and expenses, if any, shall be payable as agreed in writing by the Parties.

## 3.   BILLING AND PAYMENT

3.1   All payment of Hosting Fees under this Appendix I, including any remittance or refund of Hosting Fee, shall be made:

☐  via wire transfer of immediately available funds in the US Dollars to the bank account of designated by the receiving Party;

☒ via transfer in digital currency Tether (USDT); or

☐ via other methods: N/A.

The Parties agree that BITMAIN shall be entitled to make payments via the foregoing methods in its sole discretion. BITMAIN shall have no liability resulting from making

payments to Service Provider using the information provided herein including in the event that Service Provider fails to update its payment information.

3.2    Service Provider agrees to receive payment in digital currency, by way of a transfer of [USDT] to the digital wallet address of

ERC:

[0x1cf1e542C140A2b19613B28a771eaAA8286c5923]:

The exchange rate between the [USDT] and US Dollars: USDT/US$=1/1. The Parties agree that Service Provider would  charge an additional handling fee for each payment, which would not exceed 0.1% of the payment.

## 4.    VOLUNTARY POWER-OFF AND LOW POWER MODE

For the Data Center Facility, there is:

☐ A. no Minimum Power Commitment.

☒ B. a Minimum Power Commitment of 12.5MW.

## 5.    TERM

Term. Unless otherwise agreed in writing by the Parties, the Agreement shall commence on the Effective Date and expire on the [second(2nd)] anniversary of the Initial Date.

## 6.    NOTICE

Initial address of Service Provider:

Address:       [254 Chapman Rd STE 209, Newark, Delaware 19702]

Attn:           [Support Department]

Email:          [info@hashvalley.us]

## 7.    DATA CENTER FACILITY STAFF

Initial Data Center Facility Staff (subject to update by BITMAIN from time to time):

| Name of Staff Member | Title/Role of Staff Member |
|---|---|
| TBD | N/A |
| TBD | N/A |

## 8.    PREVAILING PROVISION

In the event of any discrepancy between this Appendix I and the Agreement, the provisions of Appendix I shall prevail.

# BITMAIN

## EXHIBIT A

### INFORMATION MEMORANDUM OF DATA CENTER FACILITY

Service Provider:    OLD CONST LLC.

Submission Date:    [November 11, 2024]

Ref. Number:    [  ]

| BASIC INFORMATION | | | | | | |
|---|---|---|---|---|---|---|
| Location | 252 TN-140, Puryear, TN 38251, the US | | | | | |
| Jurisdiction | TN | | | | | |
| Land Area (sq. m) | 2 acres | | | | | |
| Building Area (sq. m) | 42 containers | | | | | |
| Construction Structure | ☐ Steel Structure ☐ Warehouse ☒ Container | | | | | |
| Designed No. of Racks | 7938 spaces | | | | | |
| Heat Dissipation Method | ☐ Hydro Cooling ☒ Air Cooling | | | | | |
| Local Temperature (℃) at Data Center Facility location | Max. | 37 | Min. | -3 | Avg. | 22 |
| Server Air Inlet Temperature (℃) | Max. | 35 | Min. | 0 | Avg. | 18 |
| Humidity (%) | 73% | | | | | |
| Air Pressure (kPa) | 101.591 | | | | | |
| Cost of Water (Inclusive of Water Fee and Sewage Charge) | N/A | | | | | |
| **ELECTRICAL POWER** | | | | | | |
| Power Type | ☒Grid hybrid ☐ Wind ☐ Solar ☐ Hydro ☐ Nuclear | | | | | |
| Electricity Cost (US$ / kWh) | US$ 0.035/kWh | | | | | |
| Max. Power Capacity (MW) | 25MW | | | | | |
| Minimum Power Commitment | ☐ Not Available ☒ 12.5 MW | | | | | |
| **COOLING METHODS** | | | | | | |
| Type of Cooling | ☐ Evaporative cooling (cooling tower) | | | | | |

| | ☐ Water-water heat exchange (plate heat exchanger)<br><br>　Dry cooling<br><br>*If Dry Cooling:*<br><br>☐ Highest local temperature at Data Center Facility location in summer over the past three years: _____ Celsius (_____ Fahrenheit)<br><br>☐ Average of the highest local temperature in summer of three past years at Data Center Facility location: _____ Celsius (_____ Fahrenheit)<br><br>*[Source of temperature data: _____ ]*<br><br>☒ Other:_ Air-cooling, not applicable |
|---|---|
| Use of Coolant | ☐ Deionized water<br><br>☐ Glycol antifreeze containing stabilizers<br><br>☒ Other:_ Air-cooling, not applicable |

| **Conditions of payment of Prepayment or Deposit** | |
|---|---|
| 1. | Service Provider completed the construction of the Data Center Facility and passed the inspection of the Data Center Facility by BITMAIN. |
| 2. | The Data Center Facility has the capability to connect to electrical power for the respective batch of Hosted Servers. |
| 3. | The respective batch of Hosted Servers has been on-racked and connected to electrical power. |
| 4. | The high-voltage, medium-voltage and low-voltage transformers arrived at the Data Center Facility. |
| 5. | The wiring between high-voltage and low-voltage transformers is completed. |
| 6. | The construction of infrastructure, including site hardening of the Data Center Facility, construction of facilities and buildings are completed [and availability of hydro ANTSPACE containers at the Data Center Facility]. |
| 7. | The site protection facilities of the Data Center Facility are set up, and the Data Center Facility has the capability of basic safety protection. |
| 8. | Service Provider has provided (i) exclusive server room for the Hosted Servers (Section 6.3 of the Agreement); and (ii) inventory storage and test site area (Section 6.12 of the Agreement). |
| **COMPLIANCE STATUS** | |

| Project Approval Documents | ☒ Not Available |
|---|---|
| | ☐ Provided to BITMAIN on [mm/dd/yyyy] |
| Power Purchase Agreement(s) | Service Provider obtains electricity for Data Center Facility from ☒ power supplier company or ☐ self-generated. |
| | *If electricity source is power supplier company:* |
| | ☒ Signed copy of Power Purchase Agreement provided |
| | ☒ Power Purchase Agreement provides: |
| |     ☒ Maximum load available to Data Center Facility: 25 MW |
| |     ☒ Minimum Power Commitment (if any) [If yes, the Minimum Power Commitment = 12.5 MW |
| |     ☒ Term of Power Purchase Agreement = 6 years |
| | *If electricity source is self-generated:* |
| | ☐ Power generation license provided |
| | ☐ Power generation license provides: |
| |     ☐ Maximum load permitted to be generated: _____ MW |
| |     ☐ Term of license = _____ |
| |     ☐ Conditions of license provided (unredacted) |
| | Maximum load of electricity that Service Provider can obtain is _____ MW |
| | ☐ Items provided to BITMAIN on [mm/dd/yyyy] |
| Land Title Document | ☒ Proof of land ownership (by landlord or Service Provider, as applicable) |
| | ☒ Lease Agreement between Service Provider and landlord (if applicable) |
| | ☐ Permits provided: _____ |
| | ☒ Land title documents provided to BITMAIN on [10/01/2024] |
| Installation Location of the | ☐ Distribution cabinet next to the high voltage transformer |

| Separate Meter | ☐ Distribution cabinet next to the low voltage transformer |
| | ☒ Next to the container or plant |
| | ☐ Other: _____ |
| Ultimate Beneficiary Owner of Data Center Facility and Service Provider | ☒ KYC Process for ☒ Landlord completed and ☒ Service Provider completed |
| | Landlord: |
| | ☒ KYC Form completed for Landlord |
| | ☒ Certificate of status of Landlord provided |
| | ☒ Shareholders and corporate structure of Landlord provided |
| | ☒ Ultimate beneficial owners of Landlord confirmed |
| | Service Provider: |
| | ☒ KYC Form completed for Service Provider |
| | ☒ Certificate of status of Service Provider provided |
| | ☒ Shareholders and corporate structure of Service Provider provided |
| | ☒ Ultimate beneficial owners of Service Provider confirmed |
| | <u>Fenshou Chen</u> |
| **OTHER INFORMATION** | |
| | |



## EXHIBIT B

## NOTICE OF HOSTED SERVERS' MODIFICATION

Notice Ref. Number: [    ]

[Date]

Via email

Service Provider: OLD CONST LLC. ("**Service Provider**")

Hosting Services Agreement Ref Number: [    ]

Subject: Modification of Hosted Servers

Effective Date: [    ]

This Hosted Servers Modification Notice (the "**Notice**") is being provided in accordance with the Hosting Services Agreement dated [    ] between BITMAIN TECHNOLOGIES GEORGIA LIMITED ("**BITMAIN**" or "**we**") and Service Provider.

This Notice is to inform you of the modification to the Hosted Servers as per Section 1.3 of Appendix I. BITMAIN, in its sole discretion, has decided to modify:

☐ the model of the Hosted Servers, and/or

☐ Hosting Quantity.

1.    Hosted Servers. Details of the Hosted Servers hereunder are as follows, subject to the specific model, power efficiency and quantity of the Hosted Servers actually delivered to the Data Center Facility:

| Batch No. | Model | Power Efficiency (J/T) | Hosting Quantity (Units) | Delivery date | Power-On Date |
|:---:|:---:|:---:|:---:|:---:|:---:|
| 1 | | | | | |
| 2 | | | | | |
| [TBD] | | | | | |
| In Total | | | | | |

Service Provider shall ensure each batch of Hosted Servers to be in Online Status on or before the respective Power-On Date as set forth in the table above.

2.    Deposit. The amount of the Deposit shall be revised as follows.

Docusign Envelope ID: 5E303DA5-0CDA-4532-B79E-A9B9C9C51135

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|---|---|---|---|
| 1 | | *[Please insert the corresponding Hosting Quantity]* × 3.6 (kW) × *[Please insert the Wholesale Hosting Unit Price or Settlement Hosting Unit Price, as applicable]* × 24(h) ×30(d) | |
| 2 | | *[Please insert the corresponding Hosting Quantity]* × 3.6 (kW) × *[Please insert the Wholesale Hosting Unit Price or Settlement Hosting Unit Price, as applicable]* × 24(h) ×30(d) | |
| *[TBD]* | | *[Please insert the corresponding Hosting Quantity]* × 3.6 (kW) × *[Please insert the Wholesale Hosting Unit Price or Settlement Hosting Unit Price, as applicable]* × 24(h) ×30(d) | |
| *In Total* | | | |

The aforementioned modifications are to take effect on the Effective Date. [We kindly request that you make the necessary arrangements for the on-rack and power-on of the additional Hosted Servers as specified above.] / [We confirm that BITMAIN Personnel shall provide the on-rack and power-on services associated with the Hosted Servers to be delivered.]

Capitalized terms not defined herein shall have the meaning assigned to them in the Agreement.

Please acknowledge receipt of this notice and confirm your understanding of the changes by receipt of this Hosted Servers Modification Notice by confirming receipt by email or signing and returning a copy of this notice to us within three (3) Business Days, no later than [specify deadline].

Thank you for your prompt attention to this matter.

Sincerely,


Signed for and on behalf of BITMAIN          **BITMAIN TECHNOLOGIES GEORGIA LIMITED**


By: _____
          Name:
          Title:

**Acknowledged and Agreed:**

OLD CONST LLC.

By: _____
Name: Yizheng Wang
Title: Manager

50492704.6

**APPENDIX II**

**FORM OF RECONCILIATION STATEMENT**

| Hosting Capacity 矿场容量 (MW) | Actual Hosting Quantity 实际托管数量 (Units) | Billing Period 计费周期 | Power Consumption 耗电量 (kWh) | Online Status Ratio 在线率 | Actual Hosting Unit Price 实际托管单价 (US$) | Total Hosting Fee 总费用 (US$) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**APPENDIX III**

**FORM OF CONFIRMATION OF HOSTED SERVERS' SECURITY**

Service Provider: [      ]

Submission Date: [      ]

| Date | Hosting Quantity (Units) | Site* | | Model 1 | Hashrate (T/Hs) | Sub-account Name | Online Quantity* (Units) (B) | Power-shortage Status* (Units) © | Maintenance Quantity* (Units) (D) | Total Quantity (Units) (A) = (B) + (C) + (D) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | **In Total** | | | | | | | | | |

**\* Notes:**

1. For "**Site**", please indicate the exact building of the Data Center Facility where the corresponding Hosted Servers are stored and operated.

2. "*Power-shortage Status*" means the status of a Hosted Server which has been delivered to the Data Center Facility that (a) is not powered-on yet, or (b) experiences power outage for a consecutive of twenty-four (24) hours or more after being powered-on, and is not in Maintenance Status (as defined below). For the "*Power-shortage Quantity*", please indicate the number of Hosted Servers in Power-shortage Status counted on the submission date of this Confirmation of Hosted Servers' Security.

3. "*Maintenance Status*" means the status of a Hosted Server that is experiencing defect, failure or malfunction, and has been de-racked pending maintenance or under maintenance.

4. For the "*Maintenance Quantity*", please indicate the number of Hosted Servers in Maintenance Status counted on the submission date of this Confirmation of Hosted Servers' Security.

To ensure the healthy and long-term mutual cooperation and maintain business relationships with ordinary interest between the Parties, Service Provider hereby certifies that none of the events described below have occurred and are continuing and none of the circumstances described below exist except as identified below in which case the details of each event or circumstance are set forth below in reasonable detail:

| 1. | Insolvency or | ☐ Yes | Please specify the details: |
|---|---|---|---|

| | bankruptcy proceedings initiated or threatened | ☐ No | / |
|---|---|---|---|
| 2. | Material judgments against Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 3. | Material asset reorganization of Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 4. | Material dispute, claim, litigation or arbitration involving Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 5. | Other circumstance that has had, has, or could reasonably be expected to have a material adverse effect on the business of Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |

# APPENDIX IV

## LANDLORD ACKNOWLEDGMENT AND UNDERTAKING

TO:        BITMAIN TECHNOLOGIES GEORGIA LIMITED ("**BITMAIN**")

RE:        Hosting Services Agreement between BITMAIN and the Service Provider dated [11th November, 2024] (the "**Services Agreement**"), the Collaboration Agreement between BITAMIN and Service Provider dated as of the date hereof (the "**Collaboration Agreement**"), and the Collaboration Sale Agreement between BITMAIN and the Service Provider dated as of the date hereof (the "**Sale Agreement**")

AND RE:    Lease between [TN WALL STREET LLC.] (the "**Landlord**"), as landlord, and [PURYEAR ELECTRIC LLC.] (the "**Sublandlord A**"), , as tenant, of premises located at [252 TN-140, Puryear, TN 38251] (the "**Data Centre Facility**") dated [August 1st 2024] (as may be amended, restated or replaced from time to time, the "**Lease**"), and lease between [PURYEAR ELECTRIC LLC.], as sublandlord, and [OLD CONST LLC.] (the "**Service Provider**", or the "**Tenant**"), as subtenant, of premises located at [252 TN-140, Puryear, TN 38251] (the "**Data Centre Facility**") dated [August 19th 2024] (as may be amended, restated or replaced from time to time, the "**Sublease**").

DATE:      [11th November, 2024]

---

A. **WHEREAS** pursuant to the Lease and the Sublease, the Landlord leased to the Sublandlord and the Sublandlord leased to the Tenant the Data Centre Facility;

B. **AND WHEREAS** pursuant to the Services Agreement, the Tenant agreed to provide certain hosting services to BITMAIN; and

C. **AND WHEREAS** certain assets owned by BITMAIN are, or may be, stored or kept by BITMAIN at the Data Centre Facility, including, without limitation: supercomputing servers and ancillary hardware equipment (the "**Hosted Servers**"), servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are returned for maintenance and repair, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers, and the packaging materials for the Hosted Servers (collectively, "**BITMAIN Property**");

D. **AND WHEREAS** pursuant to the Collaboration Agreement, Tenant has granted a security interest in the equipment and merchandise set out in Exhibit A hereto, and all proceeds thereof (collectively, the "**Collateral**"), a portion of which Collateral is or may be located from time to time on or about or affixed to the Data Centre Facility;

**E. AND WHEREAS** the Landlord and the Sublandlord A are, collectively, the "**LANDLORD**" in this APPENDIX IV.

**NOW THEREFORE,** for good and valuable consideration of $5.00 paid by BITMAIN to the Service Provider, the receipt and adequacy of which are acknowledged by the Service Provider, the Service Provider and the Service Provider Parent hereby irrevocably and unconditionally agree to assume full responsibility and liability for any damages to BITMAIN's rights and interests caused by the LANDLORD, as if they have made such commitments, for the commitments to be made by the LANDLORD, regardless of whether the LANDLORD has signed or is aware of this APPENDIX IV, as follows:

1. Consent. To the extent required pursuant to the terms of the Lease, the LANDLORD consents to the Tenant entering into the Services Agreement with BITMAIN and acknowledges that the Tenant is not in default of the Lease by virtue of providing hosting services to BITMAIN under the Services Agreement.

2. Security Interest. To the extent required pursuant to the terms of the Lease, the LANDLORD consents to BITMAIN's security interest in all of the Collateral. BITMAIN's security interest in the Collateral shall be superior to any interest which the LANDLORD may at any time have therein.

3. LANDLORD's Acknowledgment. The LANDLORD acknowledges that the BITMAIN Property and Collateral will at all times be considered to be personal property, and notwithstanding any rule of law or equity, no such BITMAIN Property and Collateral will constitute a fixture or become part of the Data Centre Facility, even though it may be attached to or be deemed a part of, or affixed to, the Data Centre Facility. The LANDLORD will not assert against any of the BITMAIN Property or the Collateral any present or future title or any statutory, common law, contractual or possessory charge, lien, security interest, hypothec or encumbrance, including, without limitation, by way of rights of levy, distraint or distress for rent. LANDLORD acknowledges that BITMAIN shall not in any event be liable to the LANDLORD for any obligations of the Tenant, including, without limitation, for rental or any other fees owing by Tenant to the LANDLORD.

4. Lenders. The LANDLORD covenants to obtain an acknowledgment from any lender with an interest in the Data Center Facility in favour of BITMAIN, in a form acceptable to BITMAIN acting reasonably, that the BITMAIN Property and the Collateral is not part of the secured interest and that BITMAIN shall be entitled to remove the BITMAIN Property and the Collateral in the event of a default by the LANDLORD under such financing.

5. Access. The LANDLORD agrees to not interfere or otherwise impede BITMAIN's access to the BITMAIN Property or the Collateral at the Data Center Facility and hereby grants BITMAIN and any of its Representatives to enter upon the Data Centre Facility at any time to perform maintenance on, audit the condition of, or retrieve, the BITMAIN Property and/or the Collateral. In connection therewith, the LANDLORD shall provide BITMAIN and its Representatives at no cost to BITMAIN and its Representatives with access to the BITMAIN Property and the Collateral at the Data

50492704.6

Center Facility and any service roads or other rights of way to access the Data Centre Facility.

6. <u>Notice to BITMAIN</u>. The LANDLORD will give prompt written notice to BITMAIN of any breach or default by the Tenant of its obligations under the Lease in respect of which the LANDLORD proposes to exercise any of its remedies. If the breach or default by the Tenant is not remedied within the cure periods afforded to the Tenant under the Lease, the LANDLORD shall deliver to BITMAIN a duplicate copy of the notice of intention to terminate the Lease concurrent with delivery thereof to the Tenant. BITMAIN shall be entitled to remove the BITMAIN Property and the Collateral provided that BITMAIN repairs any damage caused to the Data Centre Facility by such removal.

7. <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflict of laws. The parties hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of Texas for the purpose of any proceeding arising out of this Agreement.

8. <u>Successors and Assigns.</u> This Agreement shall be binding upon the LANDLORD and its successors and assigns and shall enure to the benefit of BITMAIN and its successors and assigns.

9. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, which when taken together shall constitute one and the same agreement.

**IN WITNESS WHEREOF** the undersigned has executed this Acknowledgement and Undertaking.

**[TN WALL STREET LLC.]**

by    _____
         Name:
         Title:

**[PURYEAR ELECTRIC LLC.]**

by    _____
         Name:
         Title:

50492704.6

**[OLD CONST LLC.]**

by   _____
Signed by:

*Yizheng Wang*

E1B3FE6F42B6436...

Name: Yizheng Wang

Title:  Manager

**<u>Exhibit A</u>**

**Collateral**

## APPENDIX V

### SERVICE PROVIDER PARENT

### GUARANTEE

**THIS GUARANTEE** is made as of the 11th day of November 2024

| | |
|---|---|
| **BETWEEN:** | Fenshou CHEN, an individual residing in 1-Y Krasnogvardeyskiy Proyezd, 21 с 2, Moscow, Russia, 123112 |
| | ("**Guarantor**") |
| **AND:** | **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia |
| | ("**BITMAIN**") |

**WHEREAS**:

A. This guarantee is provided pursuant to the Hosting Services Agreement of even date herewith between *OLD CONST LLC.* ("**Service Provider**") and BITMAIN, as amended from time to time (the "**Agreement**").

B. Guarantor directly or indirectly owns the Service Provider and has agreed to guarantee in the manner hereinafter appearing the due performance by the Service Provider of its obligations and liabilities under the Agreement.

C. BITMAIN's willingness to enter into the Agreement with the Service Provider is contingent on Guarantor providing this guarantee to BITMAIN.

D. Guarantor acknowledges that it will benefit from the Service Provider entering into the Agreement with BITMAIN.

**NOW IT IS HEREBY AGREED**, in consideration of the sum of TEN DOLLARS, and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Guarantor represents and warrants to BITMAIN that:

    i. There are no conditions precedent to the effectiveness of this guarantee that have not been satisfied or waived;

    ii. The Guarantor is an adult individual or sound mind;

    iii. Guarantor has signed this guarantee freely and voluntarily and not under duress or undue influence. The Guarantor acknowledges that there has been no unconscionability, no inequality of bargaining power or fiduciary relationship between the parties;

    iv. Guarantor fully understands the provisions of this guarantee and his or her obligations hereunder; (ii) he or she has been afforded the

opportunity to engage independent legal counsel, at his or her own expense, to explain the provisions of this guarantee and his or her obligations hereunder; and (iii) he or she has either engaged legal counsel in connection with its execution of this guarantee or has decided, in his or her sole discretion, not to do so; and

v.    This guarantee has been duly executed and delivered by the Guarantor and constitutes a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms.

2.    Guarantor does hereby absolutely, unconditionally and irrevocably guarantee, as a direct obligation to BITMAIN, its successors, transferees and assigns, the full and prompt performance and observance by Service Provider of each and every covenant, agreement, indemnity, undertaking, liability and obligation contained in the Agreement (collectively, the "**Liabilities**") subject to the limitations and exclusions set out in the Agreement which Guarantor shall be entitled to in respect of this guarantee provided that any limitation of liability shall not apply to the costs and expenses payable under Section 14 hereof.

3.    Subject to the notice requirements and cure periods set out in the Agreement, each and every default in performance, observance or payment of any of the Liabilities by Service Provider shall, give rise to a separate claim and cause of action hereunder, and separate claims or suits may be made and brought, as the case may be, hereunder as each such default occurs.

4.    The guarantee herein provided for shall be a continuing, absolute and unconditional guarantee of performance, observance and payment as aforesaid and shall remain in full force and effect until each and all of the Liabilities shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Agreement.

5.    The provisions of this guarantee are for the benefit of BITMAIN and its successors and permitted transferees, its endorsees and the assigns of the Agreement, as applicable, and nothing herein contained shall impair, as between the Service Provider and BITMAIN, the obligations of the Service Provider under the Agreement. In the event all or any part of the Liabilities are transferred, endorsed or assigned by BITMAIN to any person or persons as may be permitted by the Agreement, any reference to "BITMAIN" herein shall be deemed to refer equally to such person or persons.

6.    The liability of Guarantor shall, except for the condition specified in Section 11 of this Agreement, remain in full force and effect irrespective of and shall in no way be affected or impaired by (and no notice to Guarantor shall be required in respect of):

(a)    any compromise, release of any security (including any other guarantee, letter of credit or bond), waiver, renewal, extension, indulgence, amendment, addition, deletion, change or modification of or with respect to any of the Liabilities;

(b)    any amendment, variation, modification, supplement, termination or replacement of the Agreement;

(c) any failure, neglect or omission on the part of BITMAIN or any other Person to give Guarantor notice of the occurrence of any default by Service Provider (other than any notices required under the express terms of the Agreement) under or with respect to the Liabilities, or to realize upon any obligations or liabilities of Service Provider;

(d) any merger, consolidation, change in ownership, control, name, business, capital structure or constitution of Service Provider or any sale, lease or transfer of any of the assets of Service Provider; or

(e) any change in the ownership of any shares of the capital stock of Service Provider; or any other occurrence or circumstance whatsoever, whether similar or dissimilar to the foregoing, and any other circumstance that might otherwise constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety that might otherwise limit recourse against Guarantor.

7. The obligations and liabilities of Guarantor hereunder shall not, except as provided in the Agreement, be impaired, diminished, abated or otherwise affected by:

(a) any set-off, defense or counterclaim that Service Provider or Guarantor may have or claim to have, at any time or from time to time; or

(b) the commencement by or against Service Provider or Guarantor of any proceedings under any bankruptcy or insolvency law or laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, arrangements, compositions or extension or other similar laws.

8. BITMAIN shall not be bound to exhaust its recourse against Service Provider or others or any security (including any letter of credit and/or bond) or other guarantees it may at any time hold before being entitled to performance of or payment of the Liabilities from Guarantor, and Guarantor renounces all benefits of discussion and division.

9. It is the intent and purpose hereof that Guarantor shall not be entitled to and does hereby waive any and all defenses available to guarantors, sureties and other secondary parties at law or in equity. Without limiting the generality of the foregoing, Guarantor hereby waives notice of acceptance of the Agreement and of the non-performance by Service Provider, diligence, presentment, protest, dishonor, demand for payment from Service Provider and notice of non-payment or failure to perform on the part of Service Provider and all other notices whatsoever other than the notices required to be provided to Guarantor under the express terms of the Agreement. The guarantee hereunder is a guarantee of payment, performance and compliance and not merely a guarantee of collection. In order to hold Guarantor liable hereunder, there shall be no obligation on the part of BITMAIN at any time to demand or resort for payment or performance to Service Provider its properties or assets or to any security, property or other rights or remedies whatsoever, nor shall there be any requirement that Service Provider be joined as a party to any proceeding for the enforcement of any provision of this guarantee and BITMAIN shall have the right to enforce the provisions of this guarantee irrespective of whether or not legal proceedings or other enforcement efforts against Service Provider are pending, seeking resort to or realization upon or from any of the foregoing. Without limiting the foregoing, it is

understood that repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, Service Provider shall default under or with respect to any of the Liabilities, and that, notwithstanding recovery hereunder for or in respect of any such default, the guarantee herein shall remain in force and effect and shall apply to each and every subsequent default.

10. No act or omission on the part of BITMAIN in respect of any matter whatsoever including, without limitation, any omission in performance of its obligations under or with respect to the Liabilities shall in any way effect or impair the guarantee hereunder, save for an express written waiver or variation of its terms which shall be effective only with respect to the party granting the same and its successors and assigns. For further certainty, the foregoing shall not be construed as extending the liability of Guarantor beyond that for which Service Provider is liable under the Agreement or precluding Guarantor from raising any defenses or making any counterclaims that would be available to Service Provider in respect of any liability.

11. The guarantee hereunder shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof of any of the obligations hereunder is rescinded or must otherwise be restored or returned by BITMAIN upon the insolvency, bankruptcy or reorganization of Service Provider or otherwise, all as though such payment had not been made.

12. All payments required to be made by the Guarantor hereunder shall be made to BITMAIN free and clear of, and without deduction or withholding for, any and all present and future Taxes. If as a result of this guarantee the Guarantor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (a) the sum payable shall be increased as much as shall be necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section 12) BITMAIN receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (b) the Guarantor shall make such withholdings and deductions and (c) the Guarantor shall pay the full amount withheld or deducted to the relevant taxing or other governmental authority in accordance with applicable law. For the purposes hereof, "**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority, including any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under this guarantee or from the execution, delivery or enforcement of, or otherwise with respect to, this guarantee.

13. The liability of Guarantor under the guarantee herein shall arise forthwith after demand has been made in writing to Guarantor.

14. Guarantor agrees to pay BITMAIN all reasonable out-of-pocket costs and expenses, including reasonable legal fees, incurred by BITMAIN in connection with enforcing any of its rights hereunder.

15. A waiver of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which BITMAIN would otherwise have had on any future occasion with regard to any subsequent breach. No failure to exercise nor any delay in exercising on the part of BITMAIN any right, power or privilege hereunder

shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any other rights and remedies provided under the Agreement or otherwise by law.

16. For the avoidance of doubt, Guarantor shall not under any circumstances (i) have any liability under this guarantee that is greater than Service Provider's liability under the Agreement but this limit of liability shall not apply to the costs and expenses payable under Section 14 hereof, or (ii) be liable for a sum payable to BITMAIN under this guarantee to the extent that such sum has been paid by Service Provider under the Agreement.

17. Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon any other a communication with respect to this guarantee, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and sent:

    i.   If to Guarantor, at:

           1-Y Krasnogvardeyskiy Proyezd, 21 c 2, Moscow, Russia, 123112
           <u>Attention</u>: [Support Department]
           E-mail: [info.hashvalley.us]

    ii.   If to BITMAIN, at:

           900 Old Roswell Lakes Parkway
           Suite 310
           Roswell, GA 30076, USA
           <u>Attention</u>: Legal Department
           E-mail: legal@bitmain.com

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service, (c) in the event overnight delivery services are not readily available, if mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (d) if sent by email. Notice so given shall be effective upon receipt by the addressee, except that any communication or notice so transmitted by email shall be deemed to have been validly and effectively given on the day (if a Business Day and, if not, on the next following Business Day) on which it is transmitted if transmitted before 4:00 p.m., recipient's time, and if transmitted after that time, on the next following Business Day; provided, however, that if any notice is tendered to an addressee and the delivery thereof is refused by such addressee, such notice shall be effective upon such tender. Any party shall have the right to change its address for notice on at least five (5) Business Days' written notice to the other parties in the manner set forth herein above.

18. This guarantee and any amendment thereof, constitutes the entire agreement between the parties pertaining to the subject matter of this guarantee and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written of any of the parties in respect of the subject matter hereof. There are no conditions, representations, warranties or other agreements between the parties in connection with the subject matter of this guarantee, whether oral or written, express or implied, statutory or otherwise, except as specifically set out in this guarantee.

19. If a court of competent jurisdiction shall hold any provisions of this guarantee to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

20. Guarantor may not assign any of its rights or obligations under this guarantee without the prior written consent of BITMAIN. This guarantee shall be binding upon the Guarantor and the heirs, executors, administrators and personal representatives of the Guarantor and enure to the benefit of BITMAIN and its successors and assigns.

21. This guarantee shall be construed and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the State of Texas, without regard to principles of conflict of laws, and the Guarantor irrevocably and unconditionally submits to the non-exclusive jurisdiction of the courts of the State of Texas, without however limiting the rights of BITMAIN to bring any action or proceeding against Guarantor or its property in the courts of any other competent jurisdiction. THE GUARANTOR AND BITMAIN HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

22. The Guarantor hereby acknowledges that it has received and taken cognizance of an executed copy of the Agreement and is familiar with all the provisions thereof. The Guarantor acknowledges and agrees that he or she has received or waived independent legal advice ("**ILA**") from his or her own lawyer at his or her own cost with respect to the terms of this guarantee before its execution.

23. This guarantee may be executed in any number of counterparts, each of which shall collectively and separately constitute one and the same agreement.

**IN WITNESS WHEREOF** BITMAIN and Guarantor have executed and delivered this guarantee as of the date first written above.

**Guarantor:**

Per: _Fenshou Chen_

Signed by:
BBF80543F0FB4DA...

Name: Fenshou CHEN

**BITMAIN TECHNOLOGIES GEORGIA
LIMITED**

Per: _____

    Name:

    Title:

**APPENDIX VI**

**SUBLEASE AGREEMENT**
[252 TN-140, PURYEAR, TN 38251]

**THIS SUBLEASE AGREEMENT** (this "**Lease**") made this 11th day of November, 2024, by and between OLD CONST LLC. (the "**Sublandlord B**"), and **[BITMAIN ENTITY]** ("**Subtenant**").

**WITNESSETH:**

**WHEREAS**, by Lease and Sublease, dated as of [August 1st 2024] and [August 19th 2024] (the "**Prime Lease**"), among PURYEAR ELECTRIC LLC. (the "**Sublandlord A**"), as tenant and sublandlord, and Sublandlord B, as subtenant, and TN WALL STREET LLC., as landlord ("**Landlord**"), Sublandlord B leased certain premises located on the first floor (the "**Prime Premises**") located in the building known as [252 TN-140, Puryear, TN 38251] (the "**Building**");

**WHEREAS**, Sublandlord B desires to sublease to Subtenant, and Subtenant desires to sublease from Sublandlord B, on the terms and subject to the conditions contained in this Sublease, a portion of the Prime Premises consisting of ■ rentable square feet, as more particularly described on Exhibit A attached hereto and made a part hereof (the "**Premises**"); and

**WHEREAS**, the parties have agreed to execute this Sublease on the date hereof (the "**Effective Date**") and simultaneously with the execution of this Sublease, the Sublandlord B and Subtenant or their respective Affiliates have executed that certain Hosting Services Agreement (the "**HSA**"); capitalized terms used but not defined herein have the meanings ascribed to them in the HSA.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sublandlord B does hereby lease to Subtenant, and Subtenant hereby does lease from Sublandlord B, the Premises, together with all improvements, fixtures and attached equipment, easements, appurtenances, hereditaments with respect thereto.

**ARTICLE I**
TERM

The term (the "**Term**") of this Sublease, subject to all of the provisions and conditions hereof, shall be for the period commencing as of the Effective Date and ending on the date that is the earlier to occur of (i) sixty (60) days following the expiration or termination of the HSA and (ii) one day prior to the expiration date of the Prime Lease, unless this Sublease is sooner terminated as provided herein; provided, however, that if Sublandlord B is in default of any of its obligations under this Sublease, including the obligation to allow Subtenant to access the Premises, clause (i) of the above shall be modified to refer to the date on which Subtenant has removed all of its personal property from the Premises. The parties hereto hereby acknowledge that this Sublease is subject and subordinate to the Prime Lease and to the matters to which the Prime Lease is or shall be subordinate, and that in the event of

termination, re-entry or dispossess by the Landlord under the Prime Lease, this Sublease shall terminate as of the date of the termination of the Prime Lease.

## ARTICLE II
## USE AND OCCUPANCY

Subtenant covenants that the Premises shall, during the Term, be used for the purposes described in the HSA and for such other ancillary purposes as may be incidental thereto and for any other commercial purposes approved by Sublandlord B (which approval shall not be unreasonably withheld, conditioned or delayed) and as are otherwise consistent with the requirements of the Prime Lease.

Provided that Subtenant uses the Premises in compliance with the terms of this Sublease and the HSA, Sublandlord B covenants to ensure that the Premises complies with all the terms of the Prime Lease and with all municipal, county, state, federal or other governmental laws, statutes, codes, regulations and other requirements, including without limitation, health and safety requirements and regulations respecting the Premises, now or hereinafter in force, at its sole cost.

## ARTICLE III
## RENTAL

3.1    Base Rent. Subtenant shall pay to Sublandlord B base rent ("**Base Rent**") for said Premises to the attention of Sublandlord B at the notice address provided in Article XIV of this Sublease, One Dollar ($1.00) per each twelve-month period during the Term of this Sublease, prorated for partial periods.

3.2    Rental Tax. In addition to the rent payable by Subtenant as provided herein, Subtenant shall pay to Sublandlord B an amount equal to any and all sales, excise, privilege, transaction and other taxes (excluding income taxes) levied or assessed by any federal, state or local authority, upon the leasing of the Premises or upon the payment or receipt of rent therefore, and any business tax imposed upon Sublandlord B by any governmental authority which is based or measured in whole or in part by amounts charged or received by Sublandlord B from Subtenant under this Sublease, provided, Subtenant shall pay only the amount of such business tax that would be payable by Sublandlord B if the Premises were the only property of Sublandlord B.

## ARTICLE IV
## REAL ESTATE TAXES AND PERSONAL PROPERTY TAXES

4.1    Payment of Taxes. Sublandlord B represents and warrants that the Premises is separately assessed as a single tax parcel and that Sublandlord B will pay or cause to be paid all real estate taxes and assessments levied upon or assessed against the Premises, as required under the Prime Lease.

4.2    Payment of Personal Property Taxes. From and after the Commencement Date, Subtenant shall be responsible for all personal property taxes and assessments levied against Subtenant's personal property at the Premises, if any, during the Term. Subtenant shall use commercially reasonable efforts to cause the applicable taxing authority to bill Subtenant directly for all personal property taxes levied against Subtenant's personal property at the Premises and Subtenant shall promptly pay any such personal property taxes.

## ARTICLE V
MAINTENANCE AND REPAIRS

5.1    <u>Alterations and Improvements</u>. Subtenant may make non-structural improvements and/or alterations to the Premises that (i) ensure that the Premises is adequately demised from the remainder of the Building (including by installing locks or other security barriers) and (ii) are in compliance with the terms of the HSA, in each case without the consent of Sublandlord B; provided, however, if the consent of Landlord or Sublandlord A is required for any such improvements Sublandlord B will use its best efforts to obtain such consent. Any other alterations to the Premises or Building made by Subtenant shall require the consent of Sublandlord B and Landlord, if applicable, as described in the Prime Lease. All improvements made by Subtenant to the Premises, whether or not such improvements require Sublandlord B's prior consent pursuant to the terms hereof, shall conform to all applicable laws.

5.2    <u>Maintenance</u>. Sublandlord B shall maintain the Premises in accordance with Section 6.1 of the HSA.

5.3    <u>Mechanics Liens</u>. Subtenant shall indemnify and hold Sublandlord B harmless, including reasonable attorneys' fees and costs, from any mechanic's, materialmen or other statutory liens which may be asserted against the Premises and which relate to Subtenant's activities on or at the Premises during the Term. Subtenant shall not allow to remain undischarged any lien, encumbrance or other charge arising out of any work done or materials or supplies furnished by any contractor, subcontractor, mechanic, laborer or materialman on behalf of Subtenant which might be or become a lien or encumbrance or other charge against or upon the Premises. If any claim or lien or notice of claim or lien on account of an alleged debt of Subtenant, or any notice of contract by a person engaged by Subtenant or any of its contractors to work on the Premises, shall be filed against or upon the Premises, Subtenant shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise within thirty (30) days from and after such filing or notice is made, or shall otherwise cause the same to be addressed and resolved so as not to materially jeopardize Sublandlord B's title to the Premises.

5.4    <u>Condition of Premises at Time of Lease</u>. Sublandlord B leases to Subtenant and Subtenant leases from Sublandlord B the Premises in their "AS IS, WHERE IS, WITH ALL FAULTS" condition with no representations or warranties whatsoever except as expressly stated in this Sublease and in the HSA.

5.5    <u>Access to Premises</u>. Sublandlord B and Sublandlord B's authorized representatives shall have the right to enter upon the Premises for the following purposes: (i) upon reasonable advance written notice to Subtenant during Subtenant's regular business hours for the purpose of inspecting the same or of making repairs, additions, or alterations and (ii) in order to fulfill such party's obligations under the HSA.

## ARTICLE VI
INDEMNITY

Subtenant, from the Commencement Date, agrees to indemnify, defend, and hold Sublandlord B and its officers and employees harmless from and against any claim, loss or expense or liability (collectively, "**Losses**") for injury, death or property loss or damage occurring on the Premises proximately caused by the Subtenant or its agents. For the

avoidance of doubt, the foregoing indemnity shall not apply to any Losses caused by the actions of (i) Sublandlord B or its agents, officers or employees pursuant to the HSA or otherwise (including, without limitation, as a result of Sublandlord B's breach of the Prime Lease) or (ii) any other Person, for which Sublandlord B agrees to indemnify, defend and hold Subtenant and its officers and employees harmless from and against any Losses or liability for injury, death or property loss or damage occurring at the Premises). Further, it is expressly understood that Sublandlord B shall not impede Subtenant's access to the Premises or erect or install any locks, doors or other barriers to Subtenant's access at any time during the Term and Sublandlord B agrees to indemnify, defend and hold harmless Subtenant and its affiliates from any Losses as a result of such impediment to access. If such impediment to access is caused by Landlord or Sublandlord A or a party other than Sublandlord B, Sublandlord B shall use its best efforts to rectify such impediment. Sublandlord B also agrees to indemnify, defend and hold harmless Subtenant and its officers and employees from any Losses resulting from any default, act or omission of Sublandlord B under the Prime Lease.

Each of Subtenant's and Sublandlord B's indemnity obligations in this Section shall include indemnity against all costs, expenses, reasonable attorneys' fees and/or liabilities in, or connected with, any such claim or proceeding brought thereon in defense thereof and shall survive the expiration or termination of this Sublease.

## ARTICLE VII
### DESTRUCTION OF PREMISES

If, following the Commencement Date, any part of the improvements on the Premises shall be destroyed by any cause whatsoever or taken by eminent domain or similar procedure, in whole or in part, either party shall have the right, exercisable upon notice to the other party within thirty (30) days following such event, to terminate this Sublease with immediate effect.

## ARTICLE VIII
### QUIET ENJOYMENT

Sublandlord B covenants and agrees that if Subtenant shall pay and otherwise perform and do all the things and matters herein provided for to be done by Subtenant, Subtenant shall peaceably and quietly have, hold, possess, use, occupy and enjoy the said Premises during the Term. Subtenant and its officers, employees, guests, invitees and agents shall also have the right to use the other portions of the Prime Premises (that do not form part of the Premises) on a non-exclusive basis with Sublandlord B in order to access the Premises.

## ARTICLE IX
### ASSIGNMENT AND SUBLETTING

Subtenant shall be free to assign or sublease all or any part of its interest in this Sublease to any Affiliate of Subtenant or any third party, subject to any requirements of the Prime Lease.

## ARTICLE X
### UTILITIES

The provision of utilities to the Premises shall be governed by the terms of the HSA.

## ARTICLE XI
DEFAULT

11.1 <u>Events of Default</u>. Any of the following occurrences, conditions, or acts shall constitute an "**Event of Default**" under this Sublease:

(a) If Subtenant (i) defaults in making payment when due of any Rent and such default continues for five (5) days after Sublandlord B gives written notice to Subtenant specifying the default and demanding that it be cured, or (ii) defaults in the observance or performance of any other provision of this Sublease, and such default continues for sixty (60) days after Sublandlord B gives written notice to Subtenant specifying the default and demanding that it be cured. However, if the default cannot be cured by the payment of money and cannot with due diligence be wholly cured within the sixty (60) day period, Subtenant may have any longer period that is necessary to cure the default, so long as Subtenant initiates a cure within the sixty (60) day period, prosecutes the cure to completion with due diligence, and advises Sublandlord B from time to time, upon Sublandlord B's request, of the actions that Subtenant is taking and the progress being made; or

(b) If Subtenant files a petition in bankruptcy, for reorganization or for an arrangement under the Bankruptcy Code or any similar federal or state law, is adjudicated bankrupt or becomes insolvent, is unable to meet its obligations as they become due, or takes any corporate action in furtherance of any of the foregoing

If there is any Event of Default, Sublandlord B may elect to terminate this Sublease and/or Sublandlord B shall have the right to re-enter the Premises, subject to Subtenant's right to remove its personal property located at the Premises for a period of sixty (60) days following termination of this Sublease (the "**Removal Period**"). Sublandlord B shall be liable for any loss or damage to Subtenant's personal property during the Removal Period, but not thereafter.

11.2 <u>Sublandlord B Default</u>. If Sublandlord B has breached or failed to comply with any provision of this Sublease applicable to Sublandlord B, Subtenant will give written notice to Sublandlord B describing the alleged breach or noncompliance. Sublandlord B will not be deemed in default under this Sublease if Sublandlord B cures the breach or noncompliance within ten (10) days after receipt of Subtenant's notice or, if the same cannot reasonably be cured within such 10-day period, if Sublandlord B in good faith commences to cure such breach or noncompliance within such period and then diligently pursues the cure to completion. If Sublandlord B does not cure such breach as provided herein, Subtenant may perform the obligations of Sublandlord B, and Sublandlord B shall immediately reimburse Subtenant on demand for any reasonable and necessary costs and expenses (including reasonable attorneys' fees) which Subtenant may incur in connection with the performance of such obligations. If Sublandlord B fails to reimburse Subtenant, Subtenant may set off such amounts against installments of Base Rent due under this Sublease or Subtenant may seek to enforce specific performance of this Sublease. If Sublandlord B's default relates to a failure to provide access to or quiet enjoyment of the Premises, Sublandlord B and its direct and indirect owners and affiliates shall immediately be liable to Subtenant for all damages incurred by Subtenant as a result of such default, including actual, consequential and incidental damages.

11.3    Attorneys' Fees. If either party commences litigation against the other for the specific performance of this Sublease, for damages for the breach hereof or otherwise for enforcement of any remedy hereunder, the prevailing party shall be entitled to recover from the other party such costs and reasonable attorneys' fees as may have reasonably been incurred.

## ARTICLE XII
### SURRENDER OF POSSESSION; HOLDING OVER

12.1    Surrender. Whenever the Term shall be terminated or have expired, whether by lapse of time, forfeiture, or in any other way, Subtenant covenants and agrees that it will (or will cause the counterparty under the HSA to) at once surrender and deliver up said Premises peaceably in broom clean condition, ordinary wear and tear excepted, and remove all of Subtenant's signage and property from the Premises within sixty (60) days following such termination or expiration and restore any damage occasioned by such removal.

12.2    Holding Over. Any holding over after the expiration of the term of this Sublease with the consent of Sublandlord B shall be construed to be a tenancy from month-to-month, terminable by either Subtenant or Sublandlord B upon thirty (30) days' written notice to the other, subject to all of the terms and provisions hereof, except that the Base Rent during any such hold over period shall be one hundred and twenty-five percent (125%) of the Base Rent amount that was being paid prior to the expiration of the term of this Sublease. Any holding over after the expiration of the term of this Sublease without the consent of Sublandlord B shall be construed to be a tenancy at sufferance, with Subtenant having no right to possession of the Premises under this Sublease, and Sublandlord B having the right to recover damages from Subtenant for the period of such hold over tenancy in an amount equal to one hundred fifty percent (150%) of the Base Rent amount that was being paid prior to the expiration of the term of this Sublease.

## ARTICLE XIII
### ENVIRONMENTAL

13.1    Definition of Hazardous Materials. The term "**Hazardous Materials**" means any substance, material, or waste which is toxic, ignitable, reactive, or corrosive and which is or becomes regulated by the local or state governmental authority or the United States Government. The term "Hazardous Materials" includes, without limitation, any material or substance which is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," or "hazardous material," by any local or state law, (ii) oil and petroleum products and their by-products, (iii) asbestos, or asbestos-containing materials, (iv) designated as a "hazardous substance" pursuant to the Federal Water Pollution Control Act, (v) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, or (vi) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act.

13.2    Indemnities and Environmental Covenants. Subtenant agrees to indemnify, defend, protect and hold harmless Sublandlord B and its directors, officers, shareholders, employees and agents from all losses and all other claims, actions, losses, damages, costs and expenses of every kind, including reasonable attorneys', experts' and consultants' fees and costs,  at any time and arising from or in connection with the handling, release, threatened release, transport, storage, use or disposal, at any time, by Subtenant of Hazardous Materials at or about the Premises. Subtenant covenants with Sublandlord B that the Premises will not

be used by Subtenant during the term of this Sublease as a treatment, storage or disposal facility for Hazardous Materials, and that Subtenant will comply with all applicable environmental laws related to the Premises during the term of this Sublease in connection with the use of any Hazardous Materials by Subtenant at or about the Premises. Subtenant further agrees that it shall notify Sublandlord B promptly of any defects in the environmental condition of the Premises that Subtenant discovers during the term of this Sublease that is not already known to Sublandlord B.

Sublandlord B agrees to indemnify, defend, protect and hold harmless Subtenant and its directors, officers, shareholders, employees and agents from all losses and all other claims, actions, losses, damages, costs and expenses of every kind, including reasonable attorneys', experts' and consultants' fees and costs, incurred at any time and arising from or in connection with the handling, release, threatened release, transport, storage, use or disposal or existence, at any time, by any party (except for Subtenant) of Hazardous Materials, and Sublandlord B agrees with Subtenant that the Premises or the Building will not be used by Sublandlord B during the term of this Sublease as a treatment, storage or disposal facility for Hazardous Materials, and that Sublandlord B will comply with all applicable environmental laws related to the Premises during the term of this Sublease in connection with the use of any Hazardous Materials by Sublandlord B at or about the Premises.

13.3    Survival Clause. The warranties, representations, covenants, indemnities, and obligations contained in this Article XIII shall survive and be enforceable after expiration or termination of the Lease.

## ARTICLE XIV
### NOTICES

14.1    The provisions of Section 15.1 of the HSA are incorporated by reference as if fully set forth herein.

## ARTICLE XV
### MISCELLANEOUS

15.1    Time of Essence. Time is and shall be of the essence of this Sublease and of each term or provision hereof.

15.2    Invalidity. If any term or provision of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such te1m or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Sublease shall be valid and be enforceable to the fullest extent permitted by law.

15.3    Headings. The headings of the articles of this instrument are for convenience and reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Sublease.

15.4    Governing Law. This Sublease shall be governed by the laws of the State in which the Premises is located.

15.5    Consent. If not expressly stated otherwise in this Sublease, wherever this Sublease requires the consent of a party, Sublandlord B and Subtenant agree that such consent shall not be unreasonably withheld or delayed.

15.6    Recording. Neither party may record this Sublease. However, the parties agree to record a short form or memorandum of Lease acceptable to Subtenant if requested by Subtenant.

15.7    Broker.    Each party represents to the other that it has not dealt with any real estate broker or salesman in connection with the negotiation of this Sublease. If any person claims a commission, finder's fee or other payment no matter how described, the party whose acts or omissions are alleged to have created the alleged claim shall indemnify and hold the other harmless from liability therefor, including without limitation, the costs of defense of such claim, including reasonable attorneys' fees.

15.8    Waiver. No default in the payment of rent or any other amount set forth herein, nor the failure of Sublandlord B to enforce the provisions of this Sublease upon any default by Subtenant shall be construed as creating a custom of deferring payment or as modifying in any way the terms of this Sublease or as a waiver of Sublandlord B's right to terminate or cancel, or otherwise to enforce the provisions hereof. No express waiver by Sublandlord B of any provision, condition, or term shall affect any other than the provision, condition or term specified, and that only as specifically stated, and shall not be deemed to imply to constitute a subsequent waiver of such provision, condition or term. No breach of a covenant or condition of this Sublease shall be deemed to have been waived by Sublandlord B, unless in writing by Sublandlord B. It is expressly agreed that time shall be of the essence of this Agreement.

15.9    Entire Agreement and Amendments/Conflict with HSA. This Sublease and all of the exhibits attached hereto and the HSA shall constitute the entire agreement of the parties hereto in respect of Subtenant's use of the Premises. All prior agreements, statements or representations between the parties and their agents and/or employees relating to Subtenant's use of the Premises (other than this Sublease and the HSA), whether written or oral, are expressly merged herein and if not contained in this Sublease or any of the exhibits attached hereto or the HSA shall be of no force or effect. There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth herein or in the HSA. No alteration, amendment, change or addition to this Sublease shall be binding upon Sublandlord B or Subtenant unless reduced to writing and signed by each party. To the extent that the terms of this Sublease conflict with the terms of the HSA, the terms of the HSA shall control.

15.10    Waiver of Jury Trial. The parties agree to waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Sublease, the relationship of Sublandlord B and Subtenant, Subtenant's use or occupancy of the Premises and/or any claim of injury or damage.

15.11    Authority.    Sublandlord B and Subtenant hereby represent and warrant to the other party that such party is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that such party has full right and authority to execute and deliver this Sublease, and that each person signing on behalf of such party is authorized to do so.

15.12  Confidentiality. Sublandlord B and Subtenant acknowledges that the terms and conditions of this Sublease are to remain confidential, and may not be disclosed to anyone, by any manner or means, directly or indirectly, without the other party's prior written consent; however, Sublandlord B and Subtenant may disclose the terms and conditions of this Sublease if required by applicable law or court order, and to its affiliates, attorneys, accountants, employees and existing or prospective financial partners provided same are advised by Sublandlord B and Subtenant, as applicable, of the confidential nature of such terms and conditions and agree to maintain the confidentiality thereof (in each case, prior to disclosure). The disclosing party shall be liable for any disclosures made in violation of this Section by such disclosing party or by any entity or individual to whom the terms of and conditions of this Sublease were disclosed or made available by such disclosing party in violation hereof. The consent by the non-disclosing party to any disclosures shall not be deemed to be a waiver on the part of the non-disclosing party of any prohibition against any future disclosures.

15.13  Delivery of Notices.  Sublandlord B shall promptly forward to Subtenant copies of all relevant and material written notices delivered to Sublandlord B by the Landlord or by the Sublandlord A.

15.14  Sublandlord's Representations and Warranties.  Sublandlord hereby represents and warrants to, and covenants with, Subtenant that:

(a)    Sublandlord B is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware;

(b)    Sublandlord B has full power, authority and right to execute and deliver this Sublease and to observe and perform the provisions hereof, and the execution and delivery of this Sublease and the obligations of Sublandlord B hereunder have been duly authorized by all necessary action on the part of Sublandlord B;

(c)    this Sublease has been duly executed and delivered by Sublandlord B and constitutes legal, valid and binding obligations of Sublandlord B, enforceable against Sublandlord B in accordance with the terms hereof;

(d)    neither the execution and delivery of this Sublease, nor compliance with the provisions hereof, does or will conflict with or result in a breach of any agreement or instrument to which Sublandlord B is a party or by which Sublandlord B is bound;

(e)    the Prime Lease is in full force and effect and has not been further modified or amended, there are no other written or oral agreements made by the parties concurrently with or since the execution and delivery of the Prime Lease, and the Prime Lease alone encompasses the entire agreement between the Landlord and Sublandlord B in respect of the Premises;

(f)    neither Sublandlord B nor Landlord or Sublandlord A is in default under the Prime Lease;

(g)    the Premises are in compliance with all applicable Laws (including those relating to environmental laws but only to the extent of Sublandlord B's actions in the Demised Premises) and Sublandlord B has not received from any governmental authority or

50451923.3

other third party written notice of any pending or threatened action against the Sublandlord B asserting any violation of Laws; and

(h)    Landlord is the only third party required to provide consent to this Sublease as a condition to its effectiveness.

(i)    Sublandlord B agrees:

(i)    To pay the rent when due and payable and to observe and perform the other terms, provisions, covenants and conditions of the Prime Lease on the part of the tenant thereunder to be observed and performed, except to the extent that such terms, provisions, covenants and conditions are expressly assumed by Subtenant hereunder or such failure is due to Subtenant's default hereunder

(ii)    Not to do or suffer or permit anything to be done which would result in a default under the Prime Lease or cause the Prime Lease to be terminated, surrendered or forfeited (except if due to a default by Subtenant hereunder); and

(iii)    Not to modify or amend the Prime Lease so as to deprive in any material respect Subtenant of rights under this Sublease, or to increase, in any material respect, Subtenant's obligations under this Sublease, or to decrease in any material respect the services to be provided to Subtenant under this Sublease.

15.15    Landlord Consent.

(a)    The effectiveness of this Sublease is conditioned upon the written consent of the Landlord or Sublandlord A to this subletting.  The parties hereto shall cooperate with each other and use their good faith efforts in attempting to obtain the Landlord's consent.  Subtenant shall deliver such documents and take such actions as are required or contemplated by the Prime Lease in connection with obtaining such consent provided that such documents provide that (i) Subtenant shall not be liable for any default, act or omission of Sublandlord B under the Prime Lease and (ii) following the termination of the Prime Lease and/or this Sublease, Subtenant shall be granted prompt access to the Premises to remove its personal property and equipment therefrom.

(b)    In the event that the Landlord's consent is not obtained or if such consent is denied within forty-five (45) days of the date hereof, either party shall have the right to terminate this Sublease upon ten (10) days written notice to the other and in that event, and provided such consent does not issue by the expiration of such ten (10) day period, this Sublease shall be of no further force and effect, and all monies paid on account of the rental and/or security shall be promptly refunded.]

*(Signatures on the following page.)*

IN WITNESS WHEREOF, Sublandlord B and Subtenant have hereunto executed this Sublease the day and year first above written.

**SUBTENANT:**

**[BITMAIN ENTITY]**

By: _____

Printed Name: _____

Title: _____

**SUBLANDLORD B:**

**OLD CONST LLC.**

By: _Yizheng Wang_ (Signed by, E1B3FE6F42B6436...)

Printed Name: Yizheng Wang

Title: Manager

50451923.3

***Exhibit A to the Lease Agreement***


*Legal Description of the Premises*

■



*Depiction of Demised Premises*

■